13696

BOLING v. WOODSIDE COTTON MILLS

(171 S. E., 9)

*Messrs. Stephen Nettles* and *E. P. Riley,* for appellant,

*Mr. J. Robert Martin,* for respondent,

September 27, 1933.

The opinion of the Court was delivered by MR. JUSTICE CARTER.

In this action, commenced in the Court of Common Pleas for Greenville County, December 30, 1931, the plaintiff seeks to recover damages against the defendant, Woodside Cotton Mills, for personal injuries alleged to have been caused by the negligence and willfulness of the defendant while the plaintiff was in its employment, September 22, 1931. In its answer the defendant interposed a general denial and set up the plea of contributory negligence, and also assumption

of risk. The case was tried at the October, 1932, term of said Court before his Honor, Judge J. Henry Johnson, and a jury, resulting in a verdict for the plaintiff in the sum of $3,500.00 actual damages; his Honor having granted a nonsuit as to punitive damages, based on the defendant's motion. From judgment entered on the verdict the defendant has appealed to this Court, imputing error to the trial Judge in his refusal to grant defendant's motion for a directed verdict (as well as nonsuit) upon three grounds: (1) That the evidence fails to establish actionable negligence; (2) that as a matter of law the evidence makes out the defense of contributory negligence; and (3) as a matter of law the evidence makes out the defense of assumption of risk. On the hearing before this Court appellant abandoned the exception based on the alleged error that his Honor committed in refusing to grant the said motion for direction of a verdict as well as nonsuit as to contributory negligence. We, therefore, have to consider only the allegations of error imputed to the trial Judge in refusing the motion on the other two grounds stated, which we shall consider together.

We are unable to agree with appellant in the position that there was error in refusing the said motion, either upon the ground that the evidence fails to establish actual negligence, or that, as a matter of law, the evidence makes out the defense of assumption of risk. As we view the record of the case, there was testimony to go to the jury on this issue. In support of appropriate allegations as to the manner in which the plaintiff's alleged injuries occurred and the cause of the same, namely, that they "resulted from and were caused by the negligent and reckless acts of the defendant, Woodside Cotton Mills, its agent and servant, in the discharge of the duties it as master owed to the plaintiff as servant, in failing to furnish the plaintiff a safe place to carry on the work required of him, in failing to furnish the plaintiff safe tools and instrumentalities with which to carry on the work required of him, in failing to furnish the plaintiff safe methods and means of carrying on the work required of him, in

failing to supervise and see that the work was properly carried on," the plaintiff introduced considerable testimony. We think, however, that the testimony given by the plaintiff, alone, was sufficient to warrant his Honor, the trial Judge, in refusing defendant's said motion; and for the purpose of setting forth clearly what transpired at the time in question and how the plaintiff's injury occurred, we quote at length from his testimony. In answer to questions on his direct examination the plaintiff stated:

"Q. Were you a regular employee of the Woodside Mills? A. No, sir.

"Q. On what occasion, were you, if at all, called to work at the Woodside Mills? A. I heard they were doing some extra work down there.

"Q. To whom, upon hearing that, did you apply for work? A. Mr. Epting, the boss mechanic.

"Q. He was Mr. Epting? A. Yes, sir.

"Q. Mr. Epting, the boss mechanic? A. Yes, sir.

"Q. What was done about engaging you? A. He said he guessed he would use me.

"Q. Well, did he make any directions or send you to anyone to start to use you? A. Directed me to Mr. League.

"Q. Directed you to Mr. League? A. Yes, sir.

"Q. What position did he hold? A. Second hand of the shop.

"Q. Did this hanging of pipe come under what is known as the mechanical work of the mill? A. Yes, sir.

"Q. So you were directed by Mr. Epting to Mr. League? A. Yes, sir.

"Q. What did Mr. League do with you? A. He directed me to Mr. Hall.

"Q. All right, for what purpose? A. To help him, to help Mr. Hall.

"Q. Do what? A. About the pipe work and—

"Q. Well, about the pipe work, what was Mr. Hall doing and what did he put you to doing? A. Put me to help him put up a pipe, four inch pipe.

"Q. Well, where? A. In the machine shop.

"Q. What part? A. In the machine shop of the cotton mill.

"Q. Was he putting them on the floor or on the ceiling or where? A. Hanging them on to the ceiling.

"Q. Hanging four inch pipe, well, about how long were the pieces of pipe handled there with Mr. Hall? A. Most of them were cut up in short sections.

"Q. About how long? A. Well, I, they were different lengths.

"Q. Well, about how long? A. Some four or five feet long.

"Q. Then, you were doing this work of hanging pipes with—who was the man in charge of it? A. Mr. League, the second hand.

"Q. Well, you talk about the time when you went to work, who were you put under? A. Mr. Hall.

"Q. About how many days would you say you were engaged at that work? A. With Mr. Hall, about three days, something like that.

"Q. Mr. Hall, any one else helping, any assistants? A. Well, when we would need help, if he would have large pipe he would usually give help to help get it up.

"Q. He would call in someone else? A. Yes, sir.

"Q. Now, Mr. Boling, you worked at that, you say, two or three days, did your work cease? A. Yes, sir.

"Q. Why? A. We got out of material.

"Q. Out of material? A. Yes, sir.

"Q. You mean pipe gave out or something? A. Some of the pipe fittings.

"Q. And what occurred, then, what was your orders then? A. We were told to go home and come back next morning.

"Q. When did you go back? A. Went back at one, we were told—

"Q. That same afternoon, why, or how come you to go back? A. Got word to come back at one.

"Q. Upon reporting there who did you go to work with?
A. Mr. League told me he could not get hold of Mr. Hall,
that he must have gone out of town and—

"By Mr. Nettles: I don't think that is relevant, your
Honor.

"By Mr. Martin: That is the directions, if your Honor
please, I don't know about his going out of town, but—

"Q. Mr. Hall was not there? A. No, sir.

"Q. Who did you report to at one on the afternoon of
this occasion? A. Mr. League, the second hand.

"Q. What did he put you to doing? A. He put Mr. Baker
and myself working on the pipe, putting it up.

"Q. What process, what size pipe were you putting up?
A. Four inch.

"Q. How many pieces did you put up? A. Well, I don't
remember how many pieces, but we were putting them up
short sections at the time, one at the time.

"Q. How high was the pipe from the ground? A. Well,
it must have been something like ten or twelve feet.

"Q. Explain just how you would do that? A. Well, we
were putting it up using two ladders, short pieces, and brace
the ladders together.

"Q. And the ladders, two ladders were used by you and
the man Baker? A. Yes, sir.

"Q. Explain how you would take it up and how you would
connect it? A. We would take it up, one of us up on the
shoulder and the other one hold and get it placed and get
it ready to make the pipe, enter it into the threads of the
other pipe.

"Q. While you were doing that was there any super-
vision, any boss man come about and say anything to you?
A. Yes, sir; all along.

"Q. Who? A. Mr. Epting a time or two and Mr. League,
he would give us directions, too.

"Q. All right, sir, did you have any plumb or means
of keeping it up there straight? A. Well, we would get it out
of line sometimes.

"Q. Well, did you get it out of line any? A. Yes, sir.

"Q. Well, tell us about it? A. Mr. Epting came along and he said that the pipe was too low and raise it up.

"Q. That is while you and Baker were—A. Yes, sir.

"Q. After you started back that afternoon? A. Yes, sir.

"Q. All right, then, how many pieces, or how long in hours did you and Mr. Baker work there together before this thing happened? A. It was some little time, I don't remember just how long.

"Q. Well, tell what you were doing, Mr. Boling; where would you prepare the pipe? A. At a work bench on the outside of the mill, just at the back door of the shop, and we would prepare the pipe out there.

"Q. What would you do to this four inch pipe out there? A. We would get our measurements, and then thread them out there.

"Q. Did you have a turn-lathe or anything? A. No, sir; we were threading them by hand, a pipe machine.

"Q. While you and Baker were out there threading did Mr. Epting or the man League either come out there? A. Mr. League came up.

"Q. What position did Mr. League have? A. He was second hand.

"Q. Did you or not obey his orders; is he the man that paid you? A. Mr. Epting and Mr. League.

"Q. I say did you obey Mr. League's orders; was he a second hand there? A. Yes, sir.

"Q. Well, he came out there? A. Yes, sir.

"Q. All right, now, tell the Court and jury what was done, what was said? A. Mr. League walked up and he asked us how we were getting along and so we told him we were going along very well, we reckoned, if we got those two pieces we had cut there and we had one piece threaded and we were going to thread the other and Mr. League pitched in and helped thread it and we got them threaded and I started on toward the shop with one piece on my shoulder and Mr. Baker got the other piece and so Mr. League called

me back and told me to bring it back and join the two pieces together, it would be easier to put them together down there.

"Q. All right, now, I will ask you how long would the two pieces be where they were put together? A. They must have been somewhere around ten feet long or eleven.

"Q. Ten or eleven feet long? A. Yes, sir.

"Q. Four inch pipe? What would be the weight of it? A. I imagine around 175 pounds.

"Q. Mr. Boling, when he said that had you started with the one piece? A. Yes, sir.

"Q. Had you been putting up two pieces or one piece? A. Just one piece.

"Q. What was said when he called you back? A. I told him it would make it too heavy to put up and Mr. League said that is all right, I will help you get it up there, said we will get it up all right.

"Q. All right, sir, were they put together? A. Yes, sir.

"Q. Well, just go on and tell then what was done? A. Then Mr. League got one end and I got the other and Mr. Baker run ahead in the shop with the hangers and placed the ladders and Mr. League and I went up the ladders.

"Q. Well, you had better explain to the jury how you went up on the ladder, how far were the ladders apart? A. Must have been something like eight or ten feet apart.

"Q. Had they been that far apart when you and Baker were putting them up? A. No, sir.

"Q. Had you put up any pipe that was ten feet long before that? A. No, sir.

"Q. When you got to the ladder Baker had placed the ladder as I understand? A. Yes, sir.

"Q. And in going to it which end were you handling? A. I was in front at the end to be joined on to the place already stationed.

"Q. Tell the jury how you went up the ladder? A. I had my end on my left shoulder and Mr. League had his the same way, but Mr. League was facing my back and so we

went up the ladder together and so Mr. Baker was holding my ladder as I went up.

"Q. All right, what happened, if anything? A. Well, we got up to the top of the ladder, almost in place, and Mr. League told Mr. Baker to hand the hanger up and the same time he took the slack up that was in the pipe, it lacked about that much being up to the one ready to be·joined and, of course, that force on me, the pressure pushed my ladder from under me and consequently I come down to the floor.

"Q. What became of the pipe? A. The pipe was still remained on my shoulder.

"Q. All the way down? A. Yes, sir.

"Q. Which way did the ladder and you fall with regard to Mr. League? A. My ladder fell away from Mr. League.

"Q. What caused you to fall that way? A. On account of the ladder being pushed from under me.

"Q. What pushed it from under you? A. Taking that slack out of the pipe and it still resting on my shoulder.

"Q. Was there or not, Mr. Boling, any warning or notice given you that he was going to move the pipe in that direction? A. No, sir.

"Q. In the operation of it with Baker and with Hall was it or not necessary to give notice before you pushed the pipe? A. Certainly.

"Q. Who was supposed to give the notice, the man in front or the man behind? A. The man behind, the man in front was supposed to tell the man behind when he was ready.

"Q. When he was ready? A. Yes, sir.

"Q. Who gave the directions there in this instance from the time Mr. League came out there? A. Mr. League.

"Q. Who gave directions about Baker placing the ladders? A. Mr. League.

"Q. Who gave the directions about handing the hangers? A. Mr. League.

"Q. All right, in falling how did you catch? A. Well, I caught on my feet; Mr. Baker partly caught my body to keep me from falling on my head.

"Q. And you caught on your feet? A. Yes, sir.

"Q. What injury did you sustain? A. I got my feet bursted all to pieces, it seems.

"Q. What was the nature of the floor, wood or cement? A. Hard wooden floor.

"Q. About how far did you fall? A. Well, I don't know exactly, must have been something like nine feet or ten.

"Q. From your feet down? A. Yes, sir.

"Q. Did you make any catch or hand on to anything in falling? A. I tried to catch on to a pipe up there, but I couldn't make it, it was so suddenly done, and the pipe was a little too large to get hold of."

Bearing in mind the general rule, that in passing upon a motion for nonsuit or direction of a verdict the testimony must be considered most favorably for the plaintiff, in our opinion, the trial Judge committed no error in overruling the defendant's said motion, and properly submitted the issues to the jury. In this connection we call attention to the fact that no error is imputed to the trial Judge in his statement of the law in the case in his charge to the jury. In support of appellant's position that the trial Judge erred in refusing to grant the motions for nonsuit or direction of a verdict our attention is called to the case of *Brabham v. American Telephone & Telegraph Co.*, 71 S. C., 53, 50 S. E., 716, and to the case of *Goodman v. Western Union Telegraph Company*, 87 S. C., 499, 69 S. E., 1089, and also to other cases of this State. It seems to be the contention of appellant in the case at bar that under these cases Mr. League (referred to in the plaintiff's testimony) was a fellow servant of the plaintiff, and that, therefore, the defendant was entitled to have its said motion granted. Under our view of the record in the case at bar, and especially of the testimony above quoted, as well as the testimony of other witnesses, the testimony in the case was susceptible of more

than one reasonable inference as to whether Mr. League was acting in the capacity of a fellow servant with the plaintiff or whether he was acting in the capacity of the representative of the master at the time of the alleged injuries of the plaintiff, and whether the negligent acts of Mr. League, as a representative of the defendant, caused the alleged injuries of the plaintiff. We, therefore, think that his Honor, the trial Judge, could not hold, as a matter of law, that Mr. League was a fellow servant of the plaintiff at the time in question. Of course, the position of Mr. League at the time in question must be determined from all the surrounding circumstances bearing on the question. In this connection we call attention to the several duties devolved upon the defendant in the proper protection of the plaintiff, while in the defendant's employment. It was the duty of the defendant to furnish to the plaintiff a reasonably safe place for the plaintiff to do the work for which he was employed, to furnish a reasonably safe instrumentality, method, and means for doing the work, and to supervise the work properly, and under our view of the case, in connection with the testimony adduced at the trial, a question for the jury was presented as to whether these duties were performed by the master, and if not performed, whether the failure resulted in injury to the plaintiff as a proximate cause thereof.

It seems to be the contention of the appellant that, since the plaintiff was injured by falling from a ladder, which is considered a simple tool, he should not be permitted to recover in this action. In this connection we call attention to the fact that there was testimony from which it may reasonably be inferred that the injury of the plaintiff was not caused from a defect in the ladder, but that the injury was caused on account of the manner in which the ladders were used; that is, the mechanical arrangement of the same, for which the master was responsible, coupled with the failure of the master's alleged representative to have the ladders properly braced and tied, so

as to make the place reasonably safe and secure; and also on account of failing to have sufficient men to perform the work in safety at the time in question, the said representative, Mr. League, having promised the plaintiff to furnish the necessary help in raising the heavy and lengthy pipes and in placing and connecting the same; also, in falling from the ladder, on which plaintiff was standing with the heavy pipe resting upon his shoulder, the man who held the ladder in place and directing that servant to perform another act and at the same instant pushing the said heavy pipe against the plaintiff, without any warning to him, thus causing the plaintiff to fall from the ladder a great distance to the floor, which resulted in the injuries he received. As appears from the testimony of the plaintiff, quoted above, it may be reasonably inferred that the said Mr. League had been acting as the representative of the master, in the capacity of superintendent, and also it may be inferred from the testimony that some of the duties performed leading up to the injury in question were duties devolved upon the master and from which the master could not be relieved from liability by devolving the same upon a fellow servant. Considering the record as a whole, it is our opinion that the trial Judge committed no error in refusing the defendant's said motion and in submitting the case to the jury. Whether the plaintiff assumed the risk of the dangers connected with the work in question, in our opinion, in the light of all of the surrounding circumstances of the case was a question for the jury.

In connection with the views expressed herein we call attention to the following cases: *Maddox v. Steel-Heddle Mfg. Co.,* 149 S. C., 288, 147 S. E., 327; *Pinckney v. Railway Co.,* 92 S. C., 528, 75 S. E., 964; *Huggins v. Railway Co.,* 158 S. C., 501, 155 S. E., 839; *Damson v. Gluck Mills,* 159 S. C., 382, 157 S. E., 143.

The exceptions are overruled, and the judgment of the lower Court affirmed.

Mr. Chief Justice Blease and Messrs. Justices Stabler and Bonham concur.