15979

WESLEY v. HOLLY HILL LUMBER CO.

(43 S. E. (2d) 619)

*Messrs. T. B. Bryant, Jr.,* and *Fred R. Fanning, Jr.,* of Orangeburg, for Appellant,

*Messrs. J. Stokes Salley,* and *Felder & Rosen,* of Orangeburg, for Respondent,

August 7, 1947.

Oxner, Justice. This action was brought to recover damages on account of personal injuries sustained by F. L. Wesley on April 3, 1945, while employed by the Holly Hill Lumber Company as superintendent of its logging crew. The case was tried in October, 1946, resulting in a verdict for plaintiff in the sum of $6,000.00. The principal question for determination is whether the Court erred in refusing defendant's motions for a nonsuit and a directed verdict made at appropriate stages of the trial and in refusing a motion by defendant for judgment *non obstante veredicto* made after the verdict was rendered. Defendant contends that there was no evidence of actionable negligence on its part; that plaintiff was guilty of contributory negligence and that the neglect of duty duly complained of by plaintiff was that of a fellow servant.

The Holly Hill Lumber Company is engaged in the sawmill business. The logs for the mill are cut and removed from the swamp by means of an overhead skidder. The testimony in the record relating to the method of operating this skidder is not entirely clear to one unfamiliar with logging and the writer has encountered difficulty in following and under-

standing the details of the mechanics involved. However, the general method of operation seems clear.

Steel cables are fastened to high poles or "rig" trees and extend quite a distance into the woods or swamps. The cable is attached to the log where it is cut and the log is drawn from the woods by power from a steam engine. The person who connects the logs with the cable attachment is known as a "tong or hooker man." Frequently the log to be removed is 800 or 1,000 feet from where the engine is stationed. Usually the trees and bushes obstruct the hooker man's view of the engineer. Some system of communication between the two is necessary. At times the engineer must be notified to give more slack in the cable, at others to tighten the cable, and he must be notified when the log is hooked and ready to be pulled. Appropriate signals are given by waving or calling to a flagman stationed at some distance from the hooker man where he can be seen by the engineer. By use of the flag the signals are then relayed to the engineer. There are times during the operation of the skidder when the lines are motionless and lying on the ground, such as when the tongs are being attached to the logs or when the tongs are at the skidder and the operator is preparing to send them back into the woods. There is usually a fairly well-defined path under the cable caused by the cutting of undergrowth to facilitate the removal of the logs and by the dragging of one end of the logs in pulling them out of the woods.

The plaintiff testified that on the morning of his injury he was walking through the woods in connection with his duties as logging superintendent; that about nine o'clock when approximately 150 or 200 yards from the skidder he heard the engine stop; that he thereupon started walking toward the skidder to ascertain the trouble and in approaching observed the flagman and two hooker men, all Negroes, lying asleep on the ground; that as he was walking toward these men through mud and water, just as he stepped on a three inch sapling, a cable lying under the sapling was without any warning suddenly tightened by the starting of the

engine; and that he was caught astride the cable, thrown violently a distance of 75 feet, knocked unconscious and seriously injured. The plaintiff further testified that it was always customary to blow the whistle of the engine before tightening the cable; that the whistle was always supposed to be blown before the engine was started; that on the occasion in question it was not blown or any other signal given; and that if the whistle had been blown or if the skidder had been in operation, he would not have gone up so close.

At the time of his injury plaintiff had been working for defendant as logging superintendent for only a few months, although he had worked in this capacity at other places for a number of years and was thoroughly familiar with the work. The operation of the skidder was under the immediate supervision of a colored foreman. It was plaintiff's duty to generally supervise the logging operations. Above him there was a general superintendent. Plaintiff testified that he was not empowered to either hire or discharge the employees under him.

The defendant's testimony was to the effect that none of the logging crew were lying on the ground when plaintiff was injured and that the skidder was only stopped "to put in the slack." With reference to plaintiff's testimony that the rule or custom required the blowing of the whistle before starting the engine or tightening the cable, the witnesses for defendant testified that the whistle was blown each morning when work was commenced for the purpose of notifying the crew to take their places but thereafter the whistle was blown solely for communication purposes and not as a warning to the logging crew or others; that the engineer used the whistle to acknowledge the signals of the flagman; and that the whistle was never blown to warn others that the engine was about to be started or the cable tightened. These witnesses conceded that no whistle was blown when the cable was tightened on the occasion of the plaintiff's injury. One of the hooker men testified that he was about 50 feet away from plaintiff at the time of the accident but on account

of the underbrush did not see him until after the injury, and that the flagman was then stationed at a distance of about 200 feet from him but was not within his view. Apparently none of the crew observed plaintiff as he approached or knew that he was present until after he was injured.

Plaintiff alleges that defendant was negligent in employing incompetent and unreliable men to operate the skidder; in failing to furnish a sufficient number of men to properly carry on the work; and in failing to furnish the plaintiff with a safe place to work.

There is no evidence to sustain the allegation that the members of the logging crew were incompetent. It is true that on the day of the accident the engineer was sick and the fireman was operating the engine but the fireman was experienced in operating the skidder. The fact that he may have been negligent on this particular occasion is alone insufficient to show that he was incompetent. *Hunter v. D. W. Alderman & Sons Co.,* 89 S. C. 502, 71 S. E. 1082.

The plaintiff testified that on the morning of his injury the crew consisted of only nine men when a full crew required the services of 15 or 16. But we are unable to see any causal connection between this fact and the plaintiff's injury. The only negligence proved was the failure to warn plaintiff by the blowing of the whistle which was the duty of the engineer.

The question of whether defendant furnished plaintiff with a reasonably safe place to work requires a more extended discussion. It was necessary for plaintiff to go through the woods in supervising the logging operations. He was in the active discharge of this duty at the time of his injury. He testified that the rules required that the whistle be blown before tightening the cable and that he relied on the observance of this custom or rule for his protection in approaching the skidder. We must assume for the purpose of this discussion that there existed such a rule

or custom. It is conceded that the cable was suddenly raised and tightened without warning of any kind. The failure on the part of the engineer or skidder operator to observe the rule on this occasion constituted negligence. The difficulty is whether the duty to blow the whistle constituted a non-delegable duty on the part of the master, that is, whether the engineer in this respect was a vice principal or whether his negligence was that of a fellow servant. Upon this question the decisions are in irreconcilable conflict. 39 C. J., Master and Servant, section 721, page 611; section 743, page 632; section 749, page 638. The tendency of the more recent decisions has been to relax the rigorous rule of the fellow servant doctrine and hold the master responsible for the failure to give a warning signal required by an established rule or custom. We take the following from 35 Am. Jur., Master and Servant, section 356, page 781:

"According to some of the decisions, if the conduct of an enterprise involves the giving of monitory signals in passing progressively from detail to detail of the work, and the person who has been detailed to give the signal has been carefully chosen, the employer will not be responsible for injury which has resulted from a failure of such person to perform his duty. Within the purview of this rule, the employer is not liable for neglect in giving signals of the starting of machinery, firing of blasts, or dumping or dislodging of earth, stones, and other material. The trend of modern decisions, however, is in favor of holding the employer liable for a neglect of monitory signals as well as of general instructions."

After a careful review of the authorities, Mr. Justice Stacy (now Chief Justice) of the North Carolina Supreme Court in *Cook v. Camp Manufacturing Co. et al.,* 183 N. C. 48, 110 S. E. 608, reached the following general conclusion: " * * * when an employee is at work in a place, reasonably safe within itself, but which, by virtue of some independent work done for the master's purposes, becomes highly dangerous, unless the customary warning or signals

be given and observed, and the master has committed the execution or observance of such signals or notices to another, the person so charged with this particular duty, in this one respect, if no other, is a vice principal, and stands as the personal representative of the master. For his negligence in this regard, in the absence of any contributory negligence on the part of the plaintiff, the master is liable, because such is a positive legal obligation, and he is responsible for its negligent performance, whether he undertakes it personally or delegates it to another."

In *Conine v. Olympia Logging Co.,* 36 Wash. 345, 78 P. 932, the Court held that the operator of a logging engine was not a fellow servant of the men attaching the cable to the logs, where the engine was placed at such a distance from the place where the men were at work that they were unable to see the engineer and to guard themselves against his acts, and that the master was liable for the negligence of the engineer in starting the engine without waiting the customary signal from the men. (This case was again before the Court in 42 Wash. 50, 84 P. 407.)

In *Brabham v. American Telephone & Telegraph Co.,* 71 S. C. 53, 50 S. E. 716, 717, it is said: "In determing who are fellow servants, the test or rule in this state is not whether the servants are of different grade, rank, or authority, one of them having power to control and direct the services of another, but the test is in the character of the act being performed by the offending servant, whether it was the performance of some duty the master owed to the injured servant, the performance of which duty the master has entrusted to the offending servant."

While the foregoing test has been approved in numerous subsequent decisions and is now well established in this State, we are not altogether sure that the various decisions involving its application can be reconciled. The following cases tend to sustain defendant's contention that the plaintiff here and the operator of the skidder were fellow servants: *Jen-*

kins v. Richmond & D. Railroad Co., 39 S. C. 507, 18 S. E. 182, 39 Am. St. Rep. 750; Martin v. Royster Guano Co., 72 S. C. 237, 51 S. E. 680; Biggers v. Catawba Power Co., 72 S. C. 264, 51 S. E. 882; Wilson v. Virginia-Carolina Chemical Co., 78 S. C. 381, 58 S. E. 1019; Goodman v. Western Union Tel. Co., 87 S. C. 449, 69 S. E. 1089. It appears, however, that this Court, in line with the tendency of the later decisions elsewhere, by the following subsequent decisions modified to some extent the rigid fellow servant rule found in the earlier cases; Leopard v. Beaver Duck Mills, 117 S. C. 122, 108 S. E. 190; Maddox v. Steel Heddle Mfg. Co., 149 S. C. 284, 147 S. E. 327; Hill v. Broad River Power Co., 151 S. C. 280, 148 S. E. 870. In each of the cases just mentioned Mr. Justice Cothran filed a vigorous dissent, contending that the earlier cases were controlling. Also see Boling v. Woodside Cotton Mills, 171 S. C. 34, 171 S. E. 9.

We think the cases of Leopard v. Beaver Duck Mills and Hill v. Broad River Power Co., supra, tend to sustain the conclusion that the lower Court in the instant case properly submitted to the jury the question of whether the plaintiff and the operator of the skidder were fellow servants. In the Leopard case the plaintiff, a card grinder recently employed, was directed by another card grinder to put a screen in a machine. The screen was very near a heavy cylinder covered with teeth to catch the cotton. While the plaintiff was so engaged, the other card grinder, without notice or warning, turned the cylinder and the plaintiff's hand was caught between the cylinder and the screen, causing the injury complained of. The Court held, Mr. Justice Cothran dissenting, that the two card grinders were not fellow servants as a matter of law and that the lower Court erred in directing a verdict for the defendant. We think the facts in the instant case are stronger than those presented in the Leopard case. That case involved a transitory and non-recurring danger. Here the danger from tightening the cable constantly arose and the offending servant failed to observe an established custom

of giving signals upon which the plaintiff relied in approaching the skidder.

The work in which plaintiff and the logging crew were engaged was hazardous. All of the defendant's witnesses testified that it was exceedingly dangerous to be near this cable when the skidder was in operation. Plaintiff testified that it was not in operation as he approached and if it had been he would not have gone so near, and that he relied on the customary signal being given before the machine was started. Defendant contends that there was no custom or rule requiring a signal before tightening the cable or starting the engine. But even under this view of the facts a reasonable inference could be drawn that it was the duty of the employer to have promulgated proper rules and regulations safeguarding the employees from the danger of the cable being suddenly tightened.

It is further argued that as plaintiff was superintendent of the logging crew, it was his duty to keep and maintain the place of work in a reasonably safe condition and that he is in no position to complain if he permitted it to become unsafe. It is true that where a master delegates to a servant the duty of keeping a place in a reasonably safe condition, the servant to whom this duty is delegated cannot recover for injuries received as a result of this failure to properly discharge the duty entrusted to him. It was upon this theory that recovery was denied in *Nuckolls v. Great Atlantic & Pacific Tea Co.,* 192 S. C. 156, 5 S. E. (2d) 862. But, as stated by the Court in *Mitchell v Polar Wave Ice & Fuel Co.,* 206 Mo. App. 271, 227 S. W. 266, 269, "if the superior servant is injured due to the negligence of the inferior servant, he may recover, if the negligence of the inferior is with respect to the performance or nonperformance of a positive duty which has been delegated to the inferior servant by the master. It makes no difference at what point in the scale of employment a master goes to find a servant to perform for him a particular duty to other servants, for, when the master selects that servant to act for him in the performance of that

duty, then such servant becomes the master's *alter ego* as to that particular duty."

There is some conflict in the evidence as to whether plaintiff's authority was commensurate with his title. The operator of the skidder was not hired by him. He testified that he had no authority to hire or fire the men under him and that this was done by the general superintendent. The plaintiff's supervision of the logging was general. The skidder was under the immediate supervision of a colored foreman. It may be reasonably inferred that the operator of the skidder in respect to giving warning in question was a vice principal and stood as a personal representative of the master, and under the rule above announced the master would be responsible for his negligence. While we concede that the question is a close one, we think that the fellow servant issue was properly submitted to the jury.

We are also of opinion that there was no error in submitting the issue of contributory negligence to the jury. The plaintiff testified that when he stepped on the sapling he had not quite reached the "path" of the cable line. It was for the jury to determine whether he was negligent in assuming that the skidder would not be started until the whistle was blown. Moreover, the fact that the flagman and two of the hooker men were asleep on the ground as plaintiff approached would rather indicate that the machine was not about to be started. It is true that plaintiff after a lengthy cross-examination finally stated that he knew of a few occasions when the required signal was not given. But we would hardly be warranted in holding as a matter of law that he was negligent in assuming that the usual signal would not be given on the occasion in question.

The remaining question is whether the Court below erred in refusing a motion for a mistrial on the ground that plaintiff had improperly mentioned the matter of insurance. During the direct examination of the plaintiff the following occurred: "A. Mr. Cooler called me to the office.

"Q. Who is Mr. Cooler?    A. General Superintendent of the Holly Hill Lumber Company.

"Q. Is he the man who hired you?    A. Yes, sir.

"Q. What did he tell you?    A. He told me, asked me, said I want to get your name off the books the Insurance Company required me.

"The Court: Wait a minute, Mr. Foreman and Gentlemen of the Jury, go back to your room."

(The jury retires.)

"The Court: You can bring it out in the absence of the jury."

After the jury was excused, the plaintiff testified: "Mr. Cooler said how about signing your release the insurance company wants to get your name off the books. I told him I could not sign that because the doctor had not turned me loose." There ensued a lengthy discussion during which defendant's counsel made a motion for a mistrial which was refused. The jury was then brought back and instructed to disregard the testimony. Later during the trial defendant was permitted to prove that it carried no liability or indemnity insurance. During the charge the jury was instructed again to disregard this testimony and was further instructed as follows: "There is no insurance and no coverage on the part of the defendant and any verdict that you might render in this case against this defendant would be paid by this defendant itself, and there would be no insurance coverage, because there is no insurance."

The trial Judge stated in passing on defendant's motion for a new trial that he was satisfied that the reference to insurance was not intentionally made but inadvertently volunteered by the plaintiff who impressed him as "a man of limited mentality." It is difficult to perceive how defendant was prejudiced by this incident. The reference to insurance could not have influenced the jury when it thereafter appeared beyond dispute that defendant carried no insurance. *Association of Independent Taxi Operators v Kern,* 178 Md. 252, 13 A. (2d) 374, 131 A. L. R. 792. Moreover, as

stated by the trial Judge, the amount awarded for the injury sustained was very reasonable and does not indicate that the jury entertained any prejudice against the defendant.

Judgment affirmed.

BAKER, CJ., and FISHBURNE, STUKES and TAYLOR, JJ., concur.