533 S.E.2d 312

**Alethia SIMMONS, in her fiduciary capacity as personal representative of the estate of P.J. McBride, deceased, Respondent,**

v.

**TUOMEY REGIONAL MEDICAL CENTER, Einar Anderson, M.D., and Sandy T. Cooper, M.D. Defendants,**

**of whom Tuomey Regional Medical Center is Petitioner.**

**John H. Cooper, Respondent,**

v.

**Tuomey Regional Medical Center, Coastal Physician Services of the Southeast, Inc., formerly known as Coastal Emergency Services of the Carolinas, Inc., and Luis Muniz, M.D. Defendants,**

**of whom Tuomey Regional Medical Center is Petitioner.**

No. 25143.

Supreme Court of South Carolina.

Heard Jan. 4, 2000.

Decided June 5, 2000.

Rehearing Denied July 7, 2000.

34

Harold W. Jacobs of Nexsen Pruet Jacobs & Pollard, LLP, Columbia, for petitioner.

J. Edward Bell, III, and Eugene C. Fulton, Jr., of Bell & Moore, P.A., Sumter, for respondents.

William L. Pope of Pope & Rodgers, Columbia, for amicus curiae, the South Carolina Health Alliance.

WALLER, Justice:

This case presents the novel issue of whether a hospital owes a common law nondelegable duty to render competent service to its emergency room patients, such that it may not avoid liability for the negligent acts of emergency room physicians hired as independent contractors under a contract between the hospital and a separate corporation.

Alethia Simmons, personal representative for the estate of her father, P.J. McBride, and John H. Cooper (respondents) brought unrelated medical negligence actions against Tuomey Regional Medical Center (Tuomey Regional) and others. The circuit judge granted Tuomey Regional's summary judgment motions on the issues of actual agency, apparent agency, and nondelegable duty in both cases. The Court of Appeals reversed, addressing only the issue of the nondelegable duty. *Simmons v. Tuomey Regional Medical Ctr.*, 330 S.C. 115, 498 S.E.2d 408 (Ct.App.1998); *Cooper v. Tuomey Regional Medical Ctr.*, Op. No. 98–UP–077 (S.C. Ct.App. filed Feb. 17, 1998) (unpublished opinion citing *Simmons* ). We granted Tuomey Regional's petitions for a writ of certiorari to review the Court of Appeals' decisions. We consolidated the cases for consideration because they raise the same issue. We affirm as modified the Court of Appeals' decision to impose a nondelegable duty and reverse the grant of summary judgment to Tuomey Regional.

## FACTS

P.J. McBride received medical care at Tuomey Regional's emergency room for a head injury he suffered in a moped accident. His daughter, Simmons, signed a form consenting to treatment at the emergency room that contained a provision stating, "THE PHYSICIANS PRACTICING IN THIS EMERGENCY ROOM ARE NOT EMPLOYEES OF TUOMEY REGIONAL MEDICAL CENTER. THEY ARE INDEPENDENT PHYSICIANS, AS ARE ALL PHYSICIANS PRACTICING IN THIS HOSPITAL." Simmons said she did not read the form because she was upset about her father's injuries. She believed the physicians were Tuomey Regional employees.

The emergency room physicians examined McBride, but released him without treating a serious head injury that was visible on the back of his head, Simmons alleged. The physicians apparently believed his confused state was a result of intoxication. McBride was returned to Tuomey Regional's emergency room the next day by ambulance after his condition worsened. This time, physicians diagnosed him as suffer-

ing from a subdural hematoma[1] and transferred him to a Columbia hospital. McBride died about six weeks later of complications caused by the head injury, Simmons alleged.

Cooper, who had suffered a previous heart attack, experienced chest pains while driving. A friend drove him to Tuomey Regional's emergency room, where Cooper informed the receptionist he was having a heart attack and asked for immediate help. Cooper alleged he sat on a gurney for at least 1½ hours before seeing a doctor, causing him serious injury. Unlike Simmons, he did not sign any form containing the "independent physician" statement. He believed the physicians were Tuomey Regional employees. Both Simmons and Cooper stated in affidavits they saw no signs or other indications that the physicians, working in an area that was an integral part of the hospital campus, were not Tuomey Regional employees.

Tuomey Regional signed a contract with Coastal Physicians Services, Inc. (Coastal), in 1987.[2] The contract describes Coastal as an "independent contractor" that provides "independent-contractor physicians" to work in Tuomey Regional's emergency room on an around-the-clock basis. The contract provides that, "[e]xcept as hereinafter provided and to the extent practice and professional conduct of all Hospital's medical staff members are regulated by the Hospital, the Physicians shall not be under the direction or supervision of the Hospital in performance of their Emergency Department duties."

The contract states the physicians are not Tuomey Regional's employees, and the hospital does not directly pay or provide any benefits to the physicians. Under a 1989 amendment to the original contract, Tuomey Regional bills patients and their insurers for emergency room services provided by both it and Coastal physicians. Tuomey Regional then pays

---

1. A subdural hematoma is a localized collection of clotted blood occurring between the skull and the dura mater, the outer membrane that covers the brain and spinal cord. 5 *Attorney's Dictionary of Medicine,* S–344 (1999).

2. Tuomey Regional initially asserted the contract, which contained a confidentiality clause, was not available for public review. The patients' attorney had to agree not to disclose it before obtaining a copy.

Coastal under a formula based on the "direct cost" plus a specified amount for each hour Coastal physicians work in the emergency room. Coastal physicians must maintain their own liability insurance coverage in minimum amounts.

Coastal physicians must meet many of the same requirements as any physician who seeks staff privileges, i.e., the right to admit patients to Tuomey Regional. Coastal physicians must, for example, apply and qualify for medical staff privileges in accordance with the bylaws and regulations of the medical staff. Their professional conduct is governed by Tuomey Regional and medical staff bylaws and rules, as well as standards set by the Joint Commission on the Accreditation of Hospitals, applicable statutes, and regulations of governmental bodies.

Tuomey Regional, however, maintains much more extensive control over Coastal physicians than physicians who only have staff privileges. For example, Tuomey Regional selects the emergency room medical director from among the physicians, with the consent of Coastal. Coastal physicians must remain on Tuomey Regional's premises during their shift, and must provide services to anyone who desires treatment. Tuomey Regional has the authority to prevent any physician from working in the emergency room when it "deems the clinical performance of any Physician ... to be detrimental to the health or safety of Hospital's patients." Within five days written notice, Coastal "shall reassign that Physician from the Hospital and shall not permit him to provide further services at the Hospital without the Hospital's approval."

Tuomey Regional retains the last word in most disagreements. The contract provides that "[a]ll matters relating to the Hospital's policies, rules, regulations, services, and other items of conduct wherein the Physicians may be involved, shall be determined jointly by [Coastal] and the Hospital's Chief Executive Officer, and in the event of a disagreement ... the decision of the Hospital shall be final."

## ISSUE

Did the Court of Appeals err in holding that hospitals have a nondelegable duty under the common law to render competent service to the patients of their emergency rooms?

## STANDARD OF REVIEW

 A trial court may properly grant a motion for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), SCRCP. *See also Tupper v. Dorchester County*, 326 S.C. 318, 487 S.E.2d 187 (1997). In determining whether any triable issues of fact exist, the court must view the evidence and all reasonable inferences that may be drawn from the evidence in the light most favorable to the non-moving party. *Manning v. Quinn*, 294 S.C. 383, 365 S.E.2d 24 (1988). On appeal from an order granting summary judgment, the appellate court will review all ambiguities, conclusions, and inferences arising in and from the evidence in a light most favorable to the appellant, the non-moving party below. *Williams v. Chesterfield Lumber Co.*, 267 S.C. 607, 230 S.E.2d 447 (1976).

 The court must determine, as a matter of law, whether the law recognizes a particular duty. If there is no duty, then the defendant in a negligence action is entitled to a judgment as a matter of law. *See Ellis v. Niles*, 324 S.C. 223, 479 S.E.2d 47 (1996); *Sharpe v. South Carolina Dep't of Mental Health*, 292 S.C. 11, 16, 354 S.E.2d 778, 781 (Ct.App. 1987) (Bell, J., concurring).

## DISCUSSION

It is uncontroverted that the role that hospitals play in the delivery of health care across America has changed dramatically since the days when the doctrine of charitable immunity shielded hospitals from malpractice liability.

> The hospital of the early to mid-nineteenth century would not be recognizable as such to a modern observer. "Respectable" people who fell sick or who were injured were treated by their doctors at home; only the lowest classes of society sought help in the "hospital," which was most often a separate wing on the almshouse. As late as 1873, there were only 178 hospitals in the United States, with a total of 50,000 beds. These hospitals were private charities, and their trustees were usually unable to raise sufficient funding

to provide a pleasant stay. The hospital of the time was dirty, crowded and full of contagious diseases. The "nurses" were usually former patients. Doctors, who were not paid, tended the ill for a few hours per week out of a sense of charity mixed with the knowledge that they could "practice" their cures on the poor and charge young medical students for instruction in the healing arts. These young "house doctors" also worked without pay, practicing cures on the ill.

Steven R. Owens, Note, 1990 Wis. L.Rev. 1129, 1131–32 (description drawn from C. Rosenberg, *The Care of Strangers—The Rise of America's Hospital System* (1987)).

Until the 1940s, hospitals were protected from malpractice liability by the doctrine of charitable immunity. Courts and legislators reasoned that a charitable institution should devote its resources to the endeavor at hand and the greater good, not to reimbursing individuals injured by the institution's negligent acts. Martin C. McWilliams, Jr. & Hamilton E. Russell, III, *Hospital Liability for Torts of Independent Contractor Physicians*, 47 S.C. L.Rev. 431, 434–35 (1996); Kenneth S. Abraham & Paul C. Weiler, *Enterprise Medical Liability and the Evolution of the American Health Care System*, 108 Harv. L.Rev. 381, 385–86 (1994); Owens, *supra*, 1990 Wis. L.Rev. at 1135–36.

Hospitals and the medical sciences improved dramatically throughout the twentieth century, and with those improvements came a concomitant increase in the importance of hospitals' role in providing medical care. Today, hospitals compete aggressively in providing the latest medical technology and the best facilities, as well as in attracting patients and physicians who will funnel patients to them. Hospitals not only strive to be a source of pride in the local community, but they also seek to avoid operating at a financial loss. Regardless of whether they are profit-seeking enterprises, they are run much like any large corporation and must operate in a fiscally responsible manner. Like any business dependent upon attracting individual people as customers, hospitals in the aggregate spend billions to advertise their facilities and services in a variety of media, from newspapers and billboards to television and the Internet. Among the many forces that have caused this sea change are the commercialization of the

practice of medicine, the public's demand for access to modern medical technology, the prevalence and impact of government-funded programs such as Medicare and Medicaid, and the rise of managed care in the private sector. *See* Owens, *supra*, 1990 Wis. L.Rev. at 1130–35; McWilliams & Russell, *supra*, 47 S.C. L.Rev. at 432–38; Abraham & Weiler, *supra*, 108 Harv. L.Rev. at 382–98.

Acknowledging such changes, this Court limited the doctrine of charitable immunity in *Brown v. Anderson County Hosp. Ass'n*, 268 S.C. 479, 234 S.E.2d 873 (1977), holding that a hospital could be held liable when a plaintiff proved "the injuries occurred because of the hospital's heedlessness and reckless disregard of the plaintiff's rights." *Id.* at 487, 234 S.E.2d at 876. Four years later, the Court abolished charitable immunity in *Fitzer v. Greater Greenville South Carolina Young Men's Christian Ass'n*, 277 S.C. 1, 282 S.E.2d 230 (1981). "Public policy," Justice Ness wrote, "is a dynamic not static concept, and what was valid in the past is not necessarily a valid policy today. Moreover, when the reason for a declared public policy no longer exists, we should not hesitate to abolish it and the rules which are supported by the policy." *Id.* at 3, 282 S.E.2d at 231.[3]

As the Court of Appeals explained in the case before us,

[T]he hospital itself has come to be perceived as the provider of medical services. According to this view, patients come to the hospital to be cured, and the doctors who practice there are the hospital's instrumentalities, regardless of the nature of the private arrangements between the hospital and the physician. Whether or not this perception is accurate seemingly matters little when weighed against the momentum of changing public perception and attendant public policy.

---

**3.** Following *Brown* and *Fitzer,* the Legislature established statutory limits on amounts recoverable from a charitable institution. *See Hanvey v. Oconee Mem'l Hosp.*, 308 S.C. 1, 416 S.E.2d 623 (1992). Today, the malpractice liability of hospitals classified as charitable organizations or as governmental entities under the state Tort Claims Act is limited by statute. S.C.Code Ann. § 33–56–180 (Supp.1999) (charitable organizations); S.C.Code Ann. § 15–78–120 (Supp.1999) (governmental entities).

*Simmons,* 330 S.C. at 121, 498 S.E.2d at 411 (quoting McWilliams & Russell, *supra,* 47 S.C. L.Rev. at 473).

It is against this backdrop that we are asked to decide whether the Court of Appeals properly imposed a common law nondelegable duty on hospitals with regard to physicians who work in their emergency rooms. Tuomey Regional presents several arguments explaining why it believes the Court of Appeals erred.

## A. NOT SUPPORTED BY LAW IN SOUTH CAROLINA

Tuomey Regional contends that South Carolina law does not support the Court of Appeals' "quantum unsubstantiated leap of logic." We disagree.

The term "nondelegable duty" is somewhat misleading. A person may delegate a *duty* to an independent contractor, but if the independent contractor breaches that duty by acting negligently or improperly, the delegating person remains *liable* for that breach. It actually is the liability, not the duty, that is not delegable. The party which owes the nondelegable duty is vicariously liable for negligent acts of the independent contractor. *Simmons,* 330 S.C. at 123, 498 S.E.2d at 412; *see also* F. Patrick Hubbard & Robert L. Felix, *The South Carolina Law of Torts* 654 (1997).

This Court and the Court of Appeals have applied the nondelegable duty doctrine in several situations. An employer has a nondelegable duty to employees to provide a reasonably safe work place and suitable tools, and remains vicariously liable for injuries caused by unsafe activities or tools under the employer's control.[4] A landlord who undertakes repair of his property by use of a contractor has a nondelegable duty to see that the repair is done properly, and

---

4. *Bellamy v. Hardee,* 242 S.C. 71, 78, 129 S.E.2d 905, 909 (1963) (citing general rule, but finding employee injured by car jack had no cause of action because he was in complete charge and had not even asked for different equipment); *Jackson v. Powe,* 241 S.C. 35, 39, 126 S.E.2d 841, 842–43 (1962) (citing general rule, but finding no evidence in record that employer's negligence led to injury caused by falling cotton bale); *Wesley v. Holly Hill Lumber Co.,* 211 S.C. 40, 48, 43 S.E.2d 619, 622 (1947) (citing general rule and upholding submission of employer's negligence to jury where plaintiff was injured by logging cable).

remains vicariously liable for injuries caused by improper repairs.[5]

 A common carrier has a nondelegable duty to ensure that cargo is properly loaded and secured, and remains vicariously liable for injuries caused by an unsecured load.[6] A bail bondsman has a nondelegable duty to supervise the work of his employees, and remains vicariously liable for injuries caused by those employees.[7] A municipality has a nondelegable duty to provide safe streets even when maintenance is undertaken by the state Highway Department, and remains vicariously liable for injuries caused by defective repairs.[8]

Tuomey Regional mentions some of the above cases and argues they are distinguishable because in this case it is the independent-contractor physician—not the hospital—who controls a patient's medical treatment. Tuomey Regional also contends regulations promulgated by the state Department of Health and Environmental Control do not impose such a duty.[9]

---

**5.** *Conner v. Farmers and Merchants Bank*, 243 S.C. 132, 139–40, 132 S.E.2d 385, 388–89 (1963) (upholding jury verdict against landlord for elderly tenant who fell on brick floor negligently repaired by contractor); *Durkin v. Hansen*, 313 S.C. 343, 437 S.E.2d 550 (Ct.App.1993) (reversing grant of summary judgment to landlord where tenant slipped and fell on floor left wet by contractor hired by landlord to clean floors).

**6.** *Jenkins v. E.L. Long Motor Lines, Inc.*, 233 S.C. 87, 95–100, 103 S.E.2d 523, 527–29 (1958) (upholding jury verdict against common carrier where unsecured load shifted during transport and caused an accident that injured plaintiff).

**7.** *Carson v. Vance*, 326 S.C. 543, 550, 485 S.E.2d 126, 130 (Ct.App. 1997) (bail bondsman has nondelegable duty under statute requiring him to supervise employees' actions; thus, trial court properly considered employee's actions in foreign state in determining whether minimum contacts existed to confer jurisdiction over South Carolina bail bondsman in foreign court).

**8.** *Dolan v. City of Camden*, 233 S.C. 1, 103 S.E.2d 328 (1958) (municipalities, which have full and complete control over streets and highways within their corporate limits, are liable for injuries caused by failure to use reasonable care to keep them in a reasonably safe condition for public travel).

**9.** 24A S.C.Code Ann. Regs. 61–16 § 613 (1992) (requiring hospitals to maintain certain minimum standards and equipment to provide emer-

We find Tuomey Regional's arguments unpersuasive. The cited cases clearly illustrate that a person or entity entrusted with important duties in certain circumstances may not assign those duties to someone else and then expect to walk away unscathed when things go wrong. A principle that applies in cases of poorly repaired brick floors and sloppily loaded cargo certainly applies to situations in which people must entrust that most personal of things, their physical well-being, to physicians at an emergency room intimately connected with and closely controlled by a hospital. However, as explained further below, we do not believe it is necessary, as the Court of Appeals did, to impose an *absolute* nondelegable duty on hospitals.

## B. NOT SUPPORTED BY LAW IN OTHER JURISDICTIONS

Tuomey Regional contends that the law of other jurisdictions does not support the Court of Appeals' decision. We disagree.

Alaska, Florida, and New York courts have applied the nondelegable duty doctrine to care provided by a hospital's emergency room physicians. *See Jackson v. Power*, 743 P.2d 1376, 1385 (Alaska 1987) (holding that a general acute care hospital may not delegate its duty to provide physicians for emergency room care because the law imposes a duty on hospital to provide that health care); *superseded in part by* Alaska Stat. § 09.65.096 (2000); *Irving v. Doctors Hosp. of Lake Worth, Inc.*, 415 So.2d 55, 59 (Fla.Dist.Ct.App.1982) (holding that jury should have been instructed on nondelegable duty doctrine, as well as apparent agency doctrine, when patient alleges malpractice by emergency room physician); *Martell v. St. Charles Hosp.*, 137 Misc.2d 980, 523 N.Y.S.2d 342, 352 (Sup.Ct.1987) (suggesting New York would hold hospitals liable for the malpractice of independent emergency room physicians under the nondelegable duty doctrine).

In contrast, Texas and Missouri courts have rejected the nondelegable duty doctrine in connection with care provided by emergency room physicians. *Baptist Mem'l Hosp. System*

gency care and services, including around-the-clock access to x-ray and routine laboratory services and a licensed physician).

*v. Sampson,* 969 S.W.2d 945, 949 (Tex.1998) (finding it unnecessary to adopt nondelegable duty doctrine for malpractice by emergency room physicians because the patient may sue the negligent physician, and sue the hospital for violation of any duties owed directly to patients); *Kelly v. St. Luke's Hospital of Kansas City,* 826 S.W.2d 391 (Mo.Ct.App.1992) (declining to apply nondelegable duty because it was not in statutes or regulations, and practice of medicine in emergency room is not an inherently dangerous activity); *see also Estates of Milliron v. Francke,* 243 Mont. 200, 793 P.2d 824, 827 (1990) (refusing to apply nondelegable duty doctrine to hold hospital liable for the negligent acts of a radiologist, an independent contractor).

While few courts have adopted the nondelegable duty doctrine, numerous courts have endorsed the doctrine of apparent authority or apparent agency to hold hospitals liable when an injured patient proves a physician was the hospital's apparent agent.[10] Although it found it unnecessary to address it in the present cases, the Court of Appeals has sanctioned the use of the apparent agency doctrine in this setting. *See Strickland v. Madden,* 323 S.C. 63, 70–71, 448 S.E.2d 581, 585 (Ct.App. 1994) (hospital may be vicariously liable for negligent health care rendered by a physician who is not an employee of the hospital under doctrine of apparent agency; but plaintiff failed to show apparent agency where doctor was a private practitioner whose only connection to hospital was that he had staff privileges to admit patients); *Shuler v. Tuomey Regional Medical Ctr.,* 313 S.C. 225, 437 S.E.2d 128 (Ct.App.1993) (discussing apparent agency in negligence action against emergency room physician and hospital, but concluding plain-

---

**10.** *See e.g., Jackson v. Power,* 743 P.2d at 1379–82 (holding that hospital may be held liable for negligence of emergency room physicians under apparent agency doctrine); *Gilbert v. Sycamore Mun. Hosp.,* 156 Ill.2d 511, 190 Ill.Dec. 758, 622 N.E.2d 788, 794–96 (1993) (joining the many jurisdictions adopting the apparent agency doctrine and listing cases); *Pamperin v. Trinity Mem'l Hosp.,* 144 Wis.2d 188, 423 N.W.2d 848, 856–58 (1988) (applying the apparent agency doctrine where a radiologist misread the x-ray of an emergency room patient, and listing cases); *see also Adkins v. Hunt,* 200 W.Va. 717, 490 S.E.2d 806, 810–11 (1997) (declining to decide whether to adopt nondelegable duty doctrine in connection with emergency room physicians, and explaining that court in previous case already had held that a hospital may be liable for negligent acts of emergency room doctors not directly employed by hospital under the doctrine of agency by estoppel).

tiff did not demonstrate the physician was an apparent agent of hospital).

Under the apparent agency doctrine, the injured patient must establish that (1) the hospital consciously or impliedly represented the physician to be its agent, (2) the patient relied upon the representation, and (3) the patient changed his position to his detriment in reliance on the representation. *See Strickland v. Madden,* 323 S.C. at 70, 448 S.E.2d at 585; *Watkins v. Mobil Oil Corp.,* 291 S.C. 62, 67, 352 S.E.2d 284 (Ct.App.1986) (citing Restatement (Second) of Agency § 267 (1958)). The focus is on the acts and conduct of the principal, not the agent. *Frasier v. Palmetto Homes of Florence, Inc.,* 323 S.C. 240, 473 S.E.2d 865 (Ct.App.1996); *see also* Hubbard & Felix at 647–48, 652–56 (discussing apparent agency and nondelegable duties).

An instructive example of a court grappling with a case like those we are presented with today, and ultimately adopting an expanded theory of apparent agency, is found in three Ohio cases.

In 1987, the Ohio Court of Appeals held that a hospital has a nondelegable duty to its emergency room patients that is not affected by the hospital's contract with an independent-contractor physicians group. *Griffin v. Matthews,* 36 Ohio App.3d 228, 522 N.E.2d 1100 (1987). Three years later, the Ohio Supreme Court held that a hospital does *not* have a nondelegable duty to assure the absence of negligence in the care provided by private, independent physicians granted staff privileges. *Albain v. Flower Hosp.,* 50 Ohio St.3d 251, 553 N.E.2d 1038 (1990). The *Albain* court found *Griffin,* which dealt with emergency room physicians, inapplicable. The court did not explicitly overrule *Griffin,* but questioned its validity by describing it as a "misdirected attempt to circumvent the necessity of proving agency by estoppel." *Albain,* 553 N.E.2d at 1047.

A mere four years later, a divided Ohio Supreme Court rejected the narrowly drawn apparent agency theory it had set out in *Albain. Clark v. Southview Hosp.,* 68 Ohio St.3d 435, 628 N.E.2d 46 (1994). In *Clark,* the administrator of the decedent's estate alleged that emergency room physicians committed malpractice in the death of a woman who suffered

an asthma attack. The 26–year–old woman, who had suffered previous attacks, chose to drive to the defendant hospital. Apparently impressed by the hospital's advertising, its reputation, and her mother's belief it was the destination of choice in an emergency, the woman (with her 18–month–old daughter) had driven past another hospital's emergency room en route to the defendant hospital.

The *Clark* court comprehensively explained the shortcomings of its analysis and the narrow view expressed in *Albain*. The court described how hospitals have changed from places where physicians essentially experimented upon people too poor to summon a physician to their home to places that employ highly trained medical staffs, expensive technology, and public relations experts to parlay public confidence into paying patients. The *Clark* court adopted a broader theory that we believe ultimately will be followed by the many other courts using the apparent agency approach in this setting:

> A hospital may be held liable under the doctrine of agency by estoppel for the negligence of independent medical practitioners practicing in the hospital if it holds itself out to the public as a provider of medical services and in the absence of notice or knowledge to the contrary, the patient looks to the hospital, as opposed to the individual practitioner, to provide competent medical care. . . .

> As to notice to the plaintiff that care is being provided by independent medical practitioners, we stress that such notice, to be effective, must come at a meaningful time.

*Clark*, 628 N.E.2d at 53–54. The court went on to reject suggestions that a hospital could insulate itself from liability by giving notice to patients through consent forms signed upon admission or signs posted in the emergency room. *Id.* at 54 n. 1.

In sum, our decision is amply supported by law in other jurisdictions. Courts throughout the nation have struggled with this issue, and nearly all have held hospitals liable under one or more theories. The Ohio cases illustrate what we perceive to be the likely trend among the many courts that have adopted an apparent agency theory in these cases. Under that trend, hospitals will not be allowed to escape liability by giving last-minute notice of independent-contractor

practitioners through admission forms or emergency room signs. The result is that hospitals may be held liable for the malpractice of their emergency room physicians, regardless of whether it is through a theory of apparent agency or nondelegable duty.

We also conclude it is appropriate to find a nondelegable duty in this case because apparent agency in its traditional form requires a representation by the principal (the hospital) and proof of reliance on that representation by the patient. *See Strickland v. Madden, supra.* Most courts applying the apparent agency doctrine in the emergency room setting have relaxed those requirements substantially in order to hold the hospital liable, a decision criticized by some commentators. *See Jackson v. Power,* 743 P.2d at 1382 n. 10 (listing cases and agreeing with "the weight of authority that application of apparent authority in the hospital/emergency room physician situation does not require an express representation to the patient that the treating physician is an employee of the hospital. Nor is direct testimony as to reliance required absent evidence that the patient knew or should have known that the treating physician was not a hospital employee when the treatment was rendered"); McWilliams & Russell, *supra,* 47 S.C. L.Rev. at 448–52 (asserting that courts, confronted with the tide of changing public perception of hospitals, have employed the apparent agency doctrine without rigor in emergency room setting).

The point often made in the cases and commentary, either implicitly or explicitly, is that expecting a patient in an emergency situation to debate or comprehend the meaning and extent of any representations by the hospital—which likely would be based on an opinion gradually formed over the years and not on any single representation—imposes an unfair and improper burden on the patient. Consequently, we believe the better solution, grounded primarily in public policy reasons we explain below, is to impose a nondelegable duty on hospitals.

## C. NOT SUPPORTED BY PUBLIC POLICY

Tuomey Regional asserts that no public policy considerations support the Court of Appeals' conclusion. First, Tuo-

mey Regional argues the duty is unnecessary because physicians must carry professional liability insurance, making judgments collectible. Second, holding hospitals liable will not improve care because hospitals may not practice medicine. Third, patients do not care whether a physician is a hospital employee or independent contractor, and no one in need of medical care decides where to go based upon the relationship of the physicians with the hospital. Finally, Tuomey Regional argues that the adoption of the nondelegable duty doctrine in this setting is a decision for the Legislature to make, not the courts. We disagree.

Commentators have debated whether compensation is a goal of tort law, or simply a means by which other goals are accomplished. *See* Hubbard & Felix at 1–26 (discussing policies of tort law). Regardless, Tuomey Regional's focus on the availability of compensation misses another important aspect of tort law: the desire to give parties with crucial duties a keen incentive to do everything possible to avoid violating those duties. "Immunity fosters neglect and irresponsibility, while liability encourages the exercise of due care." *Brown v. Anderson County Hosp. Ass'n,* 268 S.C. at 487, 234 S.E.2d at 877; *see also* Hubbard & Felix at 6–10, 638–40 (discussing theory of rational avoidance of liability and policy bases for vicarious liability). Imposing a nondelegable duty on hospitals in this context fulfills both goals.

We reject Tuomey Regional's insistence that "hospitals may not practice medicine"—a point it has asserted throughout this litigation. It is true that a hospital may not decide that Patient X is to receive a dose of a particular medication twice a day; nor may a hospital order that Patient Y undergo specified tests at 2 p.m. on a particular day. Only licensed physicians may make such decisions. But the "practice of medicine" encompasses a much broader range of actions than those specific directives. It includes innumerable decisions regarding the type and quality of medical equipment, staffing levels, and the renovation or addition of facilities. Hospital and emergency room administrators make countless decisions that intimately affect the "practice of medicine" all day, every day. The contract between Tuomey Regional and Coastal in the present cases illustrates how the hospital, in ways both obvious and subtle, affects and controls the practice of medi-

cine. *See* Jeannie Pinkston, Note, 48 Okla. L.Rev. 797, 804 (1995) (stating the oft-quoted adage that "hospitals don't practice medicine, physicians do" no longer reflects public perception of a modern hospital, which has assumed the role of a profit-producing business and aggressively markets itself as an administrator and provider of comprehensive health care).

Furthermore, we disagree with Tuomey Regional's assertion that patients do not decide where to seek care based on the relationship between a hospital and its physicians. While an emergency room may be selected because it is the nearest one, patients in urban areas often may choose from several. Patients make those decisions based primarily on the reputation of the hospital, which it often has aggressively promoted, and not on the reputation of individual emergency room physicians. In such situations, patients understandably and correctly expect to be cared for by physicians and other staff members carefully selected and approved by the hospital.

We reject Tuomey Regional's contention that this decision should be left to the Legislature. Courts created, then eliminated, charitable immunity for hospitals. The same policy considerations at work in those cases make it proper for the courts to impose this nondelegable duty on hospitals. *Cf. Brown v. Anderson County Hosp. Ass'n,* 268 S.C. at 485–86, 234 S.E.2d at 876 (rejecting argument that Court should leave any changes in charitable immunity doctrine to Legislature because courts created it and it had become inconsistent with legislative and judicial policy in tort law).

We conclude the Court of Appeals properly outlined and applied the public policy considerations in question. Our decision, like those made by other courts that have considered this issue and held hospitals liable under one or more theories, is grounded primarily in those considerations. Given the fundamental shift in the role that a hospital plays in our health care system, the commercialization of American medicine, and the public perception of the unity of a hospital and its emergency room, we hold that a hospital owes a nondelegable duty to render competent service to *its* emergency room patients.

However, we conclude it is not necessary, as the Court of Appeals did in the cases at hand, to impose an *absolute* nondelegable duty on hospitals. Instead, we adopt

the approach expressed in Restatement (Second) of Torts: Employers of Contractors § 429 (1965). That section, sometimes described as ostensible agency, provides:

> One who employs an independent contractor to perform services for another which are accepted in the reasonable belief that the services are being rendered by the employer or by his servants, is subject to liability for physical harm caused by the negligence of the contractor in supplying such services, to the same extent as though the employer were supplying them himself or by his servants.

Section 429 applies not only when the injured person accepts services in the belief they are being rendered by the independent contractor's employer, but also when a third person accepts such services on the injured person's behalf and reasonably believes the services are being rendered to the injured person by the independent contractor's employer. *See* section 429 cmt. a; Restatement (Second) of Torts, Introductory Note to §§ 416–429 at p. 394 (explaining that various nondelegable duties are imposed "in situations in which, for reasons of policy, the employer is not permitted to shift the responsibility for the proper conduct of the work to the contractor").

Under section 429, the plaintiff must show that (1) the hospital held itself out to the public by offering to provide services; (2) the plaintiff looked to the hospital, rather than the individual physician, for care; and (3) a person in similar circumstances reasonably would have believed that the physician who treated him or her was a hospital employee. When the plaintiff does so, the hospital will be held vicariously liable for any negligent or wrongful acts committed by the treating physician. The hospital may attempt to avoid liability for the physician's acts by demonstrating the plaintiff failed to prove these factors.

Numerous courts have relied on section 429 in decisions allowing a plaintiff to attempt to hold a hospital vicariously liable for a purportedly independent physician's negligent acts. *E.g., Walker v. Winchester Mem'l Hosp.*, 585 F.Supp. 1328, 1330 (W.D.Va.1984); *Stewart v. Midani*, 525 F.Supp. 843, 851 (N.D.Ga.1981); *Jackson v. Power*, 743 P.2d at 1380; *Richmond County Hosp. Auth. v. Brown*, 257 Ga. 507, 361 S.E.2d

164, 166 (1987); *Gilbert v. Sycamore Mun. Hosp.*, 156 Ill.2d 511, 190 Ill.Dec. 758, 622 N.E.2d 788, 795 (1993); *Sharsmith v. Hill*, 764 P.2d 667, 672 (Wyo.1988); *Irving v. Doctors Hosp. of Lake Worth, Inc.*, 415 So.2d 55, 60 (Fla.Dist.Ct.App.1982); *Arthur v. St. Peters Hosp.*, 169 N.J.Super. 575, 405 A.2d 443, 446–47 (Law Div.1979); *Mduba v. Benedictine Hosp.*, 52 A.D.2d 450, 384 N.Y.S.2d 527, 529 (N.Y.App.Div.1976); *Smith v. St. Francis Hosp.*, 676 P.2d 279, 282 (Okla.Ct.App.1983); *Capan v. Divine Providence Hosp.*, 287 Pa.Super. 364, 430 A.2d 647, 648–650 (1980).

▮▮▮ Although the present cases involve emergency room physicians, our decision is not necessarily limited to such physicians. It is limited, however, to those situations in which a patient seeks services at the hospital as an institution, and is treated by a physician who reasonably appears to be a hospital employee. Our holding does not extend to situations in which the patient is treated in an emergency room by the patient's own physician after arranging to meet the physician there. Nor does our holding encompass situations in which a patient is admitted to a hospital by a private, independent physician whose only connection to a particular hospital is that he or she has staff privileges to admit patients to the hospital. Such patients could not reasonably believe his or her physician is a hospital employee. *See Ward v. Lutheran Hosps. & Homes Soc. of America, Inc.*, 963 P.2d 1031 (Alaska 1998) (reaffirming *Jackson, supra,* and holding that hospital was not liable under nondelegable duty or apparent agency doctrines for allegedly negligent acts of private, independent physicians who had staff privileges to treat their patients at hospital); *Menzie v. Windham Comm. Mem'l Hosp.*, 774 F.Supp. 91 (D.Conn.1991); *Jackson,* 743 P.2d at 1385; *Richmond County Hosp. Auth.*, 361 S.E.2d at 166.

▮▮▮ Viewed in the light most favorable to respondents, the record in the present cases shows that they may allege that they or their relative sought care at Tuomey Regional's emergency room based on the hospital's offering of services to the public, that they looked to the hospital to provide the care, not an individual physician, and that they were treated by physicians who reasonably appeared to be hospital employees. Genuine issues of material fact exist; therefore, summary judgment is not appropriate.

## CONCLUSION

For the foregoing reasons, we affirm as modified the Court of Appeals' decision to impose a nondelegable duty on hospitals with regard to the physicians who practice in their emergency rooms. We adopt the Restatement of Torts (Second) § 429 instead of imposing an absolute duty on hospitals. In both respondents' cases, we reverse the grant of summary judgment to Tuomey Regional on the ground of nondelegable duty.

The Court of Appeals found that its decision on the nondelegable duty issue rendered the issue of apparent agency moot. *Simmons,* 330 S.C. at 118 n. 1, 498 S.E.2d at 409 n. 1. Respondents in their brief to this Court assert the Court of Appeals' reversal of summary judgment includes a reversal of the trial judge's ruling on the apparent agency cause of action. Respondents urge this Court to affirm the reversal of summary judgment on the ground of apparent agency. Tuomey Regional, apparently believing the Court of Appeals did not rule on the apparent agency issue, contends there is no reason to remand the case to the Court of Appeals for further consideration because the apparent agency issue is without merit.

We could remand the apparent agency issue to the Court of Appeals for its consideration and ordinarily would find that an appropriate disposition. However, we conclude it is unnecessary to remand this case to the Court of Appeals because the parties have raised both issues to us on the merits and because the analyses of apparent agency and nondelegable duty are so closely intertwined in this instance. Although closely related, each is a viable theory an injured patient may assert. Accordingly, we also reverse the grant of summary judgment to Tuomey Regional on the ground of apparent agency in both respondents' cases.

We remand respondents' cases to circuit court for further proceedings consistent with this opinion.

AFFIRMED AS MODIFIED.

TOAL, Acting C.J., MOORE and BURNETT, JJ., and Acting Justice GEORGE T. GREGORY, Jr., concur.