GAZIANO, J.
*1194 On February 21, 2012, Mary L. Miller was fatally stabbed in her home by "N," her neighbor and a former patient of Steward Carney Hospital.[4] In this appeal, we consider whether the hospital owed Miller and her family a duty of care and, if so, whether a breach of that duty occurred when one of its physicians released "N" from involuntary psychiatric commitment.
From January 9 through January 30, 2012, "N" had been held involuntarily at the hospital pursuant to several court orders. From January 7 through January 8, 2012, he was a patient in the hospital's emergency room because no psychiatric beds were available. After a January 9, 2012, order for a three-day commitment pursuant to G. L. c. 123, § 12 (a ) and (b ), expired, on January 12, 2012, the hospital's superintendent filed a petition for commitment under G. L. c. 123, §§ 7 and 8. A hearing on the petition was conducted on January 19, 2012, before a Boston Municipal Court judge, and an order of commitment "for a period not to exceed six months or until there is no longer a likelihood of serious harm by reason of mental illness, whichever period is shorter," issued on the same day.
On January 30, 2012, "N"'s treating physician, who had submitted the initial petition for involuntary hospitalization, determined that "N" no longer posed a likelihood of serious harm by reason of mental illness and ordered that he be discharged, pursuant to the terms of the commitment order. Twenty-two days after his release, "N" broke into Miller's apartment and killed her in the presence of her eight year old granddaughter.
The plaintiffs, a representative of Miller's estate and the mother of Miller's granddaughter, commenced an action in the Superior Court raising claims of, among other things, wrongful death; wilful, wanton, and reckless infliction of emotional distress; negligence in violating the terms of an order of civil commitment; and loss of consortium. A Superior Court judge concluded that the hospital did not owe the plaintiffs any duty of care, and allowed the defendants' motion for summary judgment.
We discern no error in the judge's ruling that the hospital did not owe the victim or her family any duty of care at the time of the killing. The order of civil commitment to hold "N," which arose out of the *1195 actions of an individual medical professional's clinical judgment, did not impose an independent duty on the hospital for "N"'s treatment, and did not require the hospital to exercise any medical judgment as to the appropriateness of release. Accordingly, while Miller's death was tragic, because the hospital did not owe a duty of care to Miller or to her family at the time of her death, we affirm the judge's decision to grant summary judgment to the hospital.
1. Background. The following facts are drawn from the summary judgment record. We view them in the light most favorable to the nonmoving party, here, the plaintiffs. See Godfrey v. Globe Newspaper Co., 457 Mass. 113, 119, 928 N.E.2d 327 (2010).
"N"'s family took him to Steward Carney Hospital for a psychiatric evaluation on January 7, 2012. The Boston area emergency services program recommended that "N" be admitted for stabilization and medical evaluation. A medical evaluation form dated January 8, 2012, noted that "N" said that he had threatened to kill a family member; the form noted that the family member "N" reported as having threatened to kill was not the same person that the family had reported as the subject of the threat. The family also reported that "N"'s behavior had been "bizarre" and that he had been talking to himself and to a television in his room. The evaluation form stated that "N" had a history of psychiatric illness, including a previous episode in which "N" had been brought to the hospital after police had responded to a report that he was threatening his mother with a knife.
"N" remained in the emergency room until a bed in the hospital's psychiatric unit became available on January 9, 2012. On that date, "N"'s treating physician filed a petition for emergency restraint and hospitalization pursuant to G. L. c. 123, § 12 (a ) and (b ). That statute authorizes a licensed physician to hospitalize a patient for a three-day period if the physician "has reason to believe that failure to hospitalize such person would create a likelihood of serious harm by reason of mental illness." G. L. c. 123, § 12 (a ).
At the expiration of the three-day period, the superintendent of the hospital filed a petition for commitment under G. L. c. 123, §§ 7 and 8 ; these statutes allow the superintendent of a psychiatric facility to seek an initial commitment of up to six months, and thereafter an extension of a commitment for up to one year, see G. L. c. 123, § 8 (d ), when the superintendent "determines that the failure to hospitalize would create a likelihood of serious harm by reason of mental illness," see G. L. c. 123, § 7 (a ). Following a hearing, a judge of the Boston Municipal Court found that "N" was "mentally ill and that ... failure to retain ['N'] in a facility would create a likelihood of serious harm, and there is no less restrictive alternative for said person." The judge ordered "N" "be committed to the [hospital] for a period not to exceed six months or until there is no longer a likelihood of serious harm by reason of mental illness, whichever period is shorter."
On January 30, 2012, "N"'s treating physician examined him and determined that he no longer presented a serious risk of harm due to his mental illness. The physician noted that his behavior had improved with medication, he appeared to be at his usual "baseline" level of functioning, and his aggression towards other patients had ceased. Accordingly, under the terms of the order of commitment, "N" was released that day.
On February 21, 2012, "N" broke into the home of Miller, his neighbor, and stabbed her to death. Miller's then eight year old granddaughter was present in the *1196 apartment at the time; she was not attacked and was physically unharmed.
2. Prior proceedings. The plaintiffs filed a complaint in the Superior Court, asserting claims of wrongful death due to negligence; wrongful death by gross negligence; wrongful death by wilful, wanton, and reckless conduct; conscious pain and suffering due to wilful, wanton, and reckless conduct; conscious pain and suffering due to gross negligence; and conscious pain and suffering due to negligence; as well as claims brought on behalf of Miller's granddaughter for reckless infliction of emotional distress, and grossly negligent infliction of emotional distress; and claims of the granddaughter's mother for consequential damages for loss of consortium and expenses for mental health care. The claims were alleged separately against each of the defendants. All of the claims were premised on the plaintiffs' assertion that the hospital "violated the January 19, 2012 Order of the Justice of the Municipal Court of the City of Boston ordering that 'N' be committed to the [hospital] 'for a period not to exceed six months or until there is no longer a likelihood of serious harm by reason of mental illness, whichever period is shorter ...,' by releasing ... 'N' eleven days later, at which time there was a likelihood of serious harm to all persons who came in contact with ... 'N', including Mary L. Miller."
The defendants filed a motion for summary judgment, arguing that (1) they owed no legal duty to the plaintiffs; (2) there is no cause of action in negligence for violating a court order; and (3) there was no special relationship that gave rise to a duty to control "N." Following oral argument and supplemental briefing, a Superior Court judge granted the defendants' motion for summary judgment. The judge "decline[d] to apply common law [to the plaintiffs' claims, as they requested,] where there is clear, unambiguous statutory guidance to the contrary," in the form of G. L. c. 123, § 36B. That statute provides that a licensed mental health professional owes no duty "to take reasonable precautions to warn or in any other way protect a potential victim or victims of said professional's patient," except in a narrow set of circumstances not present here. Relying on G. L. c. 123, § 36B, and a decision of the Appeals Court, Shea v. Caritas Carney Hosp., Inc., 79 Mass. App. Ct. 530, 541, 947 N.E.2d 99 (2011), the judge concluded that the hospital owed no duty of care to the plaintiffs. The plaintiffs filed a timely notice of appeal, and we allowed their motion for direct appellate review.
3. Discussion. a. Legal standard. "Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Boazova v. Safety Ins. Co., 462 Mass. 346, 350, 968 N.E.2d 385 (2012), citing Mass. R. Civ. P. 56 (c), as amended, 436 Mass. 1404 (2002). A moving party is entitled to summary judgment where a nonmoving party, who bears the burden of proof, has no reasonable expectation of proving an essential element of the claim. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716, 575 N.E.2d 734 (1991). "Our review of a motion judge's decision on summary judgment is de novo, because we examine the same record and decide the same questions of law." Kiribati Seafood Co. v. Dechert, LLP, 478 Mass. 111, 116, 83 N.E.3d 798 (2017).
"To prevail on a negligence claim, a plaintiff must prove that the defendant owed the plaintiff a duty of reasonable care, that the defendant breached this duty, that damage resulted, and that there was a causal relation between the breach of the duty and the damage."
*1197 Jupin v. Kask, 447 Mass. 141, 146, 849 N.E.2d 829 (2006). Whether a party owes a duty of care to another is a legal question, "determine[d] 'by reference to existing social values and customs and appropriate social policy.' " Id. at 143, 849 N.E.2d 829, quoting Cremins v. Clancy, 415 Mass. 289, 292, 612 N.E.2d 1183 (1993). The question here is whether the hospital owed a duty of care to third-party victims, either arising out of the court order or through a common-law, special relationship between the hospital and its patient, "N."
b. Statutory duty of care. In their complaint, the plaintiffs argued that the hospital violated the commitment order issued under G. L. c. 123, §§ 7 and 8, by negligently releasing "N" when his treating physician certified that he no longer presented a serious risk of imminent harm due to mental illness; the plaintiffs maintained that the order was directed at the hospital alone, the hospital delegated the duty to a particular physician, and the hospital was responsible for the decision to release "N." At a hearing on the motion for summary judgment, the plaintiffs' attorney asserted that, because the order was directed at the hospital, the case did not raise any question of respondeat superior, as it was the hospital's specific duty to comply with the order and to decide whether "N" should be released.
On appeal, the plaintiffs contend that the order was directed at the hospital, thus creating a duty on its part, and that a hospital may not delegate such a duty to an employee. In support of this argument, the plaintiffs point to the text of the commitment order, which required that "N" "be committed to [the hospital]," as well as to deposition testimony by the superintendent in which he stated that he understood the commitment order to have been directed at the hospital. In addition, they claim that the duty created by the order exists independently of any duty owed by the licensed medical providers who signed the petitions for commitment and the release and, therefore, any duty that might have been imposed on the hospital under the doctrine of respondeat superior.
Therefore, the plaintiffs maintain, "by releasing ... 'N' eleven days [after his commitment under G. L. c. 123, §§ 7 and 8,] at which time there was a likelihood of serious harm to all persons who came in contact with ['N']," the hospital violated a nondelegable duty of care. The clinical determination to release "N," however, was made, and could only have been made, by an individual mental health professional, here, his treating physician. We conclude that any duty involving the release of "N," and any negligence in authorizing his release under the terms of the order of commitment, belonged to this treating clinician, who was required to use professional medical judgment in determining that commitment was required and when it was no longer needed.
"[A] duty finds its source in existing social values and customs" (citation and quotations omitted). Jupin, 447 Mass. at 146, 849 N.E.2d 829. When considering whether to recognize a duty, we consider any acts of the Legislature relevant to the issue in question. See, e.g., id. at 153-154, 849 N.E.2d 829 (relying on "legislative enactments acknowledging that the unauthorized use of firearms is a significant problem and placing requirements on owners of guns for the purpose of preventing their use by persons not competent to use them" in recognizing existence of "a duty of the person in control of the premises to exercise due care with regard to the storage of guns on the premises"). That the duty to make a clinical determination whether release is appropriate falls on an individual medical professional is consistent with the statutory scheme involving involuntary psychiatric commitment, which reflects the *1198 Legislature's understanding of the professional role of health care professionals in making clinical judgments.
Here, the initial petition to hold "N" under G. L. c. 123, § 12, was filed by his treating mental health clinician, following her clinical determination that "N" presented a "[s]ubstantial risk of physical harm to other persons as manifested by evidence of homicidal or other violent behavior." See G. L. c. 123, § 12 (a ) ("Any physician who is licensed ... who, after examining a person, has reason to believe that failure to hospitalize such person would create a likelihood of serious harm by reason of mental illness may restrain or authorize the restraint of such person and apply for the hospitalization of such person for a [three]-day period ..."). The superintendent of the hospital then filed the petition for "N"'s commitment under G. L. c. 123, §§ 7 and 8. The petition provides: "[the superintendent] has determined that failure to hospitalize ['N'] would create a likelihood of serious harm by reason of mental illness." See G. L. c. 123, § 7 (a ) ("The superintendent of a facility may petition the district court ... for the commitment to said facility [of the patient] ..."). The notice of the hearing on "N"'s commitment states that the "petition for involuntary commitment has been filed by ... Medical Director of the [hospital]." The order of commitment itself specifies that "N" is to be delivered to the superintendent of the hospital.
In deciding whether to impose a duty of care, we also must bear in mind that the statute was written in recognition of psychiatric patients' fundamental right to liberty. See O'Connor v. Donaldson, 422 U.S. 563, 576, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975) ; Newton-Wellesley Hosp. v. Magrini, 451 Mass. 777, 785, 889 N.E.2d 929 (2008) (emergency commitment under G. L. c. 123, § 12 [b ], implicates "significant liberty interests"). "The right of an individual to be free from physical restraint is a paradigmatic fundamental right." Matter of E.C., 479 Mass. 113, 119, 92 N.E.3d 724 (2018), quoting Commonwealth v. Knapp, 441 Mass. 157, 164, 804 N.E.2d 885 (2004). See Matter of N.L., 476 Mass. 632, 637, 71 N.E.3d 476 (2017) ("The infringement of a person's liberty interest resulting from involuntary commitment for six months is massive" [quotation omitted] ). Thus, a psychiatric civil commitment should involve the "least burdensome or oppressive controls over the individual that are compatible with the fulfilment of the dual purposes of our statute, namely, protection of the person and others from physical harm and rehabilitation of the person." Commonwealth v. Nassar, 380 Mass. 908, 917-918, 406 N.E.2d 1286 (1980).
The Legislature has determined that the judgment of a qualified mental health professional is necessary in order to restrain an individual's liberty by involuntary psychiatric commitment. In addition, because of the fundamental liberty interests at issue, a court must consider and approve an order of involuntary psychiatric commitment, after a hearing and after making findings; an involuntary commitment is appropriate only where it is established beyond a reasonable doubt that "(1) such person is mentally ill, and (2) the discharge of such person from a facility would create a likelihood of serious harm." G. L. c. 123, § 8 (a ). See Superintendent of Worcester State Hosp. v. Hagberg, 374 Mass. 271, 276, 372 N.E.2d 242 (1978). See generally O'Connor, 422 U.S. at 575, 95 S.Ct. 2486 ("there is still no constitutional basis for confining such persons involuntarily if they are dangerous to no one).
Concordantly, the Legislature has determined that a qualified mental health professional may make a clinical determination *1199 to release a psychiatric patient, consistent with "the highest possible standards of professional treatment," without notifying the court that issued the order of commitment, because a clinician is in the best position to determine whether a patient no longer poses a threat of serious harm. See Nassar, 380 Mass. at 912 n.5, 406 N.E.2d 1286, quoting 1970 House Doc. No. 5021, at 2. The Legislature chose not to impose a separate duty on a hospital, and not to delay the release of a patient that the hospital no longer has a legal right to confine. Continuing to hold a patient where a mental health professional has determined that there is no threat of serious harm would result in a violation of the patient's constitutional liberty interest and would be a violation of G. L. c. 123, §§ 7 and 8. Consistent with its view of medical and legal standards, the Legislature left such determinations to qualified mental health professionals.
The same standard of serious harm guides mental health care professionals' responsibility to report; "foreseeability of harm to the plaintiff" is one of the "major" considerations in determining if a mental health professional has a duty to warn a potential victim. See Tarasoff v. Regents of Univ. of Cal., 17 Cal. 3d 425, 434, 131 Cal.Rptr. 14, 551 P.2d 334 (1976). General Laws c. 123, § 36B, defines an individual mental health professional's narrow duty to warn in the Commonwealth. In balancing a patient's right to privacy with public safety, the statute strongly favors a patient's right to privacy, as is evident in the narrowness of the duty to warn. See G. L. c. 123, § 36B ; Tarasoff, supra at 440-441, 131 Cal.Rptr. 14, 551 P.2d 334 ("recogniz[ing] the public interest in supporting effective treatment of mental illness and in protecting the rights of patients to privacy," while acknowledging narrow duty to warn specific, identifiable victim about threat). The right to be free from physical restraint is at least as fundamental as a patient's right to privacy. We are reluctant to disrupt the Legislature's careful balancing and to impose a duty on hospitals, which do not make individual clinical judgments, where the Legislative mandate and constitutional protections counsel against doing so.
Nonetheless, a hospital is not necessarily free from all liability arising out of a clinical determination that a patient no longer presents an imminent risk of serious bodily harm due to mental illness. A hospital may be liable under a theory of respondeat superior, arising out of an employment relationship, for the actions of its medical professionals. See Dias v. Brigham Med. Assocs., Inc., 438 Mass. 317, 323, 780 N.E.2d 447 (2002) (hospital may be vicariously liable for negligent conduct of employee doctor, notwithstanding hospital's "inability to exert direction and control over his clinical decisions"). In this case, however, the plaintiffs' did not raise any claim of vicarious liability; they also did not bring separate claims against the individual medical professionals who provided care to "N" and who ordered his release.[5]
*1200 In addition, a hospital owes third parties a duty of reasonable care in hiring, training, and supervising the medical professionals who care for its patients. See Roe No. 1 v. Children's Hosp. Med. Ctr., 469 Mass. 710, 714, 16 N.E.3d 1044 (2014) ("there is little doubt that [defendant hospital] had a duty to supervise and monitor [third party's] conduct while he was employed as a physician"); ibr.US_Case_Law.Schema.Case_Body:v1">id. ("an employer whose employees have contact with members of the public in the course of conducting the employer's business has a duty to exercise reasonable care in selecting and supervising its employees"). See Tucson Med. Ctr., Inc. v. Misevch, 113 Ariz. 34, 36, 545 P.2d 958 (1976) ("Hospitals have been given and have accepted the duty of supervising the competence of the doctors on their staffs"); Johnson v. Misericordia Community Hosp., 99 Wis. 2d 708, 744, 301 N.W.2d 156 (1981) ("a hospital owes a duty to its patients to exercise reasonable care in the selection of its medical staff and in granting specialized privileges")."[6] As with potential liability under a theory of respondeat superior, however, the plaintiffs did not allege negligent hiring, training, or supervision in their complaint.
c. Duty arising from a special relationship. The plaintiffs maintain that the hospital owed them a duty of care because of the special relationship between the hospital and "N." The Restatement (Third) of Torts provides that "[c]ustodians of those who pose risks to others have long owed a duty of reasonable care to prevent the person in custody from harming others." Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 41(f) (2012). The Restatement continues, "well-established custodial relationships include hospitals for the mentally ill." Id. Such a relationship is a qualifying "[c]ustodial relationship[ ]" because it "exist[s], in significant part, for the protection of others from risks posed by the person in custody." Id. Cf. Rogers v. Commissioner of the Dep't of Mental Health, 390 Mass. 489, 495, 458 N.E.2d 308 (1983) (noting that commitment under G. L. c. 123, §§ 7 and 8, "is for public safety purposes").
A special relationship arises out of the level of control exercised by the custodian. Compare Bradley Ctr., Inc. v. Wessner, 161 Ga. App. 576, 581-582, 287 S.E.2d 716, aff'd, 250 Ga. 199, 296 S.E.2d 693 (1982) (mental health facility owed duty of care to third parties arising out of its special relationship with patient because facility had sufficient control over patient who could not leave premises during his commitment without being issued leave pass), with Davenport v. Community Corrections of the Pikes Peak Region, Inc., 962 P.2d 963, 968 (Colo. 1998), cert. denied, 526 U.S. 1068, 119 S.Ct. 1462, 143 L.Ed.2d 547 (1999) (private correction facility did not have duty to control its residents, where many residents had full-time employment, *1201 provided their own transportation, and "readily obtain[ed]" passes to be off premises). We agree that "N"'s involuntary commitment under G. L. c. 123, §§ 7 and 8, arising out of the order, created a special relationship under the common law. Contrast Leavitt v. Brockton Hosp., Inc., 454 Mass. 37, 42-43, 907 N.E.2d 213 (2009) (in absence of "statutory responsibilities," hospital had no duty to control voluntary outpatient).
The defendants argue that G. L. c. 123, § 36B, abrogated any common-law duty that the hospital owed to the plaintiffs, including a duty to control. The defendants' argument is unavailing. The statute specifically addresses mental health care professionals and the limitations on their duty as professionals to protect third parties. Such statutory immunity would run to hospitals under a claim based on a theory of respondeat superior for alleged negligence by an employee; the statute does not, however, absolve a hospital of its institutional responsibilities, including a duty to control a lawfully admitted patient. See Riley v. Davison Constr. Co., 381 Mass. 432, 438, 409 N.E.2d 1279 (1980) ("A statute is not to be interpreted as effecting a material change in or a repeal of the common law unless the intent to do so is clearly expressed" [citation omitted] ); A. Scalia & B.A. Garner, Reading Law: The Interpretation of Legal Texts § 52, at 318-319 (2012) ("statutes will not be interpreted as changing the common law unless they effect the change with clarity").
As did the Superior Court judge, the defendants rely on Shea, 79 Mass. App. Ct. at 541, 947 N.E.2d 99, in support of their claim that the hospital may not be directly liable for the clinical judgments of its mental health professional. In that case, the Appeals Court rejected the plaintiff's argument that a mental health professional owed a common-law duty to a third-party victim of a former patient. The court held that G. L. c. 123, § 36B, does not show "the intention to permit additional liability based on common law." Shea, supra. The court did not consider whether the hospital in that case might have had an independent duty to control; rather, the court held that the statute "clearly abrogated any common-law duty owed by a mental health professional to a patient," id. at 540, 947 N.E.2d 99, and that "[a]ny liability of the corporate defendants would be based on the theory of respondeat superior." Id. at 531, 947 N.E.2d 99 n.3. We agree that the language of G. L. c. 123, § 36B, that a mental health professional has no duty to "warn or in any other way protect a potential victim" would prevent the imposition of a duty to control on a mental health professional and, accordingly, on a hospital under a theory of respondeat superior. See G. L. c. 123, § 36B. As discussed, however, the statute does not address the independent, common-law duty of a hospital to control a patient who has been civilly committed, and the legislative history does not suggest an intent to displace a duty owed by an institution.
Nonetheless, the hospital's duty to control is more narrow than the plaintiffs contend. The hospital had a duty to hold "N" while he was lawfully "committed to the [hospital] for a period not to exceed six months." "The [hospital's] duty of care is limited to the period of actual custody." Restatement (Third) of Torts, supra at § 41(f). The hospital's duty to control "N" ceased when his treating physician reached the clinical judgment that "N" no longer presented a likelihood of serious harm by reason of mental illness, and released "N." Under the terms of the commitment order, "N"'s commitment to the hospital was no longer authorized once the clinical determination was made.[7] The hospital's act of *1202 releasing him was not merely proper, it was required by the terms of the order.
The plaintiffs argue that the treating physician's clinical judgment about the risk "N" posed was inaccurate and incorrect, that "N" should not have been released, and that the hospital retained control over him. As discussed supra, however, the hospital had no role in the clinical determination that "N" was in a suitable condition to be released. As the duty to hold "N" followed directly from the order of commitment, when his treating mental health professional determined that he no longer presented a likelihood of serious harm and ordered his release, the hospital no longer had actual control of "N" or the authority to hold him. In the absence of this special relationship, the hospital had no duty to hold, or otherwise to control, "N" three weeks later when he attacked the victim in her home.
Order allowing motion for summary judgment affirmed.

The defendant Steward Health Care System, LLC, argued that, as the parent company of the defendant Steward Carney Hospital, Inc., it had no liability for any actions by Steward Carney Hospital. The parties agreed to stay that argument pending a decision on the motion for summary judgment, which could make the matter moot. For convenience in this appeal, we refer to both defendants as "Steward Carney Hospital" or "hospital."

We note that, had a claim been made against any of the individual mental health care professionals involved in "N"'s care, the immunity provisions of G. L. c. 123, § 36B (1), would have been applicable to them, and the professionals involved almost certainly would have had individual immunity. Although we need not decide whether an exception applied in this case, in order for the statutory exception to the immunity provisions of G. L. c. 123, § 36B (1), to apply, a patient must make a specific threat about a specific person, and must have an apparent ability and intent to carry out that threat. Here, there is no indication in the record that the defendant ever threatened Miller or her family.

Some courts in other jurisdictions have determined that, in limited circumstances, hospitals may be directly liable for care provided in their emergency rooms, and that hospitals have a duty to provide adequate emergency care. At least three States have recognized a hospital's "nondelegable duty" to provide adequate emergency medical care. See Simmons v. Tuomey Regional Med. Ctr., 341 S.C. 32, 44-46, 533 S.E.2d 312 (2000) (observing that "Alaska, Florida, and New York courts have applied the nondelegable duty doctrine to care provided by a hospital's emergency room physicians," noting that some States have explicitly rejected it, and that still others have not addressed it and instead have relied on claims of vicarious liability). We are not aware of any court that has recognized a nondelegable duty on the part of a hospital to provide inpatient mental health care, or of any State that has extended such a nondelegable duty of care to liability to third parties who are injured as a result of the care provided. See Simmons, supra at 44-45, 533 S.E.2d 312, and cases cited.

By contrast, where a release was as a result of clerical error, or where a patient escaped, the fact that a patient is no longer in the hospital's custody does not necessarily end the duty to control. See Jean W. v. Commonwealth, 414 Mass. 496, 514 & n.16, 610 N.E.2d 305 (1993) (Liacos, C.J., concurring) (Department of Corrections and parole board may owe duty to injured third parties arising from special relationship with prisoner who was released in error).