JUSTICE WECHT, dissenting
To ensure frank, probing assessments of physicians by their peers-those most qualified to conduct such reviews-our General Assembly enacted the Peer Review Protection Act ("the PRPA" or "the Act").[1] The Act protects a host of records associated with peer review from discovery in malpractice litigation, where the disclosure of such records might discourage candid and effective peer review. The Act is not a model of clarity. That lack of clarity prompts me to dissent respectfully from the Majority's holding.
At issue in this case[2] is whether Monongahela Valley Hospital ("MVH") and *309 UPMC Emergency Medicine, Inc. ("ERMI") (collectively, "Appellants") can invoke the peer review privilege enshrined in the PRPA under the circumstances of this case. The following principles govern how we interpret the Act:
[O]ur object is to ascertain and effectuate the intention of the General Assembly, giving effect, if possible, to all provisions of the statute under review. Generally, the best indication of legislative intent is the statute's plain language. Further, the plain language of each section of a statute must be read in conjunction with [the others], construed with reference to the entire statute. We presume that the General Assembly does not intend a result that is absurd, impossible of execution, or unreasonable, and that the General Assembly intends the entire statute to be effective and certain.
When words of a statute are ... ambiguous, a reviewing court looks to other principles of statutory construction, among them: the occasion and necessity for the statute; the circumstances under which the statute was enacted; the mischief to be remedied; the object to be attained; [and] the consequences of a particular interpretation....
Bowling v. Office of Open Records , 621 Pa. 133, 75 A.3d 453, 466 (2013) (citations omitted); see 1 Pa.C.S. §§ 1921 -22.
Generally, the party invoking an evidentiary privilege bears the burden of showing that the privilege applies. Once the party has done so, the burden shifts to the adverse party to establish that an exception applies or that the privilege has been waived. Yocabet v. UPMC Presbyterian , 119 A.3d 1012, 1019 (Pa. Super. 2015) ; see In re Investigating Grand Jury of Phila. Cty. No. 88-00-3503 , 527 Pa. 432, 593 A.2d 402, 406 (1991).
The learned Majority aptly explains certain principles governing the interpretation and application of evidentiary privileges in general:
"[E]videntiary privileges are not favored, as they operate in derogation of the search for truth." In re Thirty-Third Statewide Investigating Grand Jury , 624 Pa. 361, 86 A.3d 204, 215 (2014). As we have stated, "exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." Commonwealth v. Stewart , 547 Pa. 277, 690 A.2d 195, 197 (1997) (quoting Hutchison v. Luddy , 414 Pa.Super. 138, 606 A.2d 905, 908 (1992) ).
Maj. Op. at ----. Thus, an evidentiary privilege may contravene truth-seeking only when it serves "a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth." Id. (quoting In re Grand Jury Investigation , 918 F.2d 374, 383 (3d Cir. 1990) ).
But our view of evidentiary privileges becomes less restrictive when the General Assembly has created the privilege. The Majority elaborates on statutory privileges as follows:
Statutory privileges reflect public policy determinations by the General Assembly, and "where the legislature has considered the interests at stake and has granted protection to certain relationships or categories of information, the courts may not abrogate that protection on the basis of their own perception of public policy unless a clear basis for doing so exists in a statute, the common law, or constitutional principles." McLaughlin v. Garden Spot Vill. , 144 A.3d 950, 953 (Pa. Super. 2016) (quoting V.B.T. v. Family Servs. of W. Pa. , 705 A.2d 1325, 1335 (Pa. Super. 1998), aff'd , *310 556 Pa. 430, 728 A.2d 953 (1999) (per curiam ) ).
Maj. Op. at ---- - ----.
In my view, it is precisely because the General Assembly's judgment is presumptively embodied in the specific statutory provisions that, where the statute provides for certain specific exceptions to the privilege, we generally may not manufacture additional exceptions to that privilege by judicial fiat. Thus, in Castellani v. Scranton Times, L.P. , 598 Pa. 283, 956 A.2d 937 (2008), where the Shield Law that protected a reporter from disclosing his sources was subject to one statutory exception, we held that "we are not at liberty to create other[ exceptions] that the Legislature, in its wisdom, chose not to include in the text of the statute." Id. at 951 ; cf. Commonwealth ex rel. Maurer v. Witkin , 344 Pa. 191, 25 A.2d 317, 319 (1942) (invoking and describing the interpretive principle of expressio unius est exclusio alterius , providing that the mention of one thing in a law implies the exclusion of the things not expressed)
The peer review privilege that Appellants invoke here is defined broadly:
§ 425.4 Confidentiality of review organization's records
The proceedings and records of a review committee shall be held in confidence and shall not be subject to discovery or introduction into evidence in any civil action against a professional health care provider arising out of the matters which are the subject of evaluation and review by such committee and no person who was in attendance at a meeting of such committee shall be permitted or required to testify in any such civil action as to any evidence or other matters produced or presented during the proceedings of such committee or as to any findings, recommendations, evaluations, opinions or other actions of such committee or any members thereof: Provided, however, [t]hat information, documents or records otherwise available from original sources are not to be construed as immune from discovery or used in any such civil action merely because they were presented during proceedings of such committee, nor should any person who testified before such committee or who is a member of such committee be prevented from testifying as to matters within his knowledge, but the said witness cannot be asked about his testimony before such a committee or opinions formed by him as a result of said committee hearings.
63 P.S. § 425.4.
The Act defines "peer review" as follows:
"Peer review" means the procedure for evaluation by professional health care providers of the quality and efficiency of services ordered or performed by other professional health care providers, including practice analysis, inpatient hospital and extended care facility utilization review, medical audit, ambulatory care review, claims review, and the compliance of a hospital, nursing home or convalescent home or other health care facility operated by a professional health care provider with the standards set by an association of health care providers and with applicable laws, rules and regulations....
63 P.S. § 425.2.
The Reginellis seek discovery of the performance file for Marcellus Boggs, M.D. Brenda Walther, M.D., prepared the file on behalf of ERMI, her employer, and furnished it to MVH. The Majority holds that the privilege applies only if Dr. Walther acted as a "review organization" in preparing the performance file. The Act defines that term broadly as well:
*311 "Review organizations" means [a]ny committee engaging in peer review, including a hospital utilization review committee, a hospital tissue committee, a health insurance review committee, a hospital plan corporation review committee, a professional health service plan review committee, ... a physicians' advisory committee, ... a nursing advisory committee, any committee established pursuant to the medical assistance program, and any committee established by one or more State or local professional societies, to gather and review information relating to the care and treatment of patients for the purposes of (i) evaluating and improving the quality of health care rendered; (ii) reducing morbidity or mortality; or (iii) establishing and enforcing guidelines designed to keep within reasonable bounds the cost of health care. It shall also mean any hospital board, committee or individual reviewing the professional qualifications or activities of its medical staff or applicants for admission thereto. It shall also mean a committee of an association of professional health care providers reviewing the operation of hospitals, nursing homes, convalescent homes or other health care facilities.
Id.
The Majority's analysis builds upon the premise that, the language of the Act being plain and unambiguous, we must follow it where it leads, no matter how unintuitive or even counterintuitive the result. In finding the Act unambiguous in all relevant particulars, the Majority's approach falls into tension with the contrary conclusion of several members of this Court in McClellan v. Health Maintenance Organization of Pennsylvania , 546 Pa. 463, 686 A.2d 801 (1996). The Opinion in Support of Affirmance ("OISA") in that case observed that, "[w]hile the definition of 'professional health care provider' set forth in the Act does not specifically include IPA[-] model HMOs, its terms are broad enough that we may or may not read the Act as explicitly excluding such organizations. The words of the Act defining 'health care provider,' then, are ambiguous." Id. at 805. And in his Opinion in Support of Reversal ("OISR"), Justice Nigro observed that "whether HMOs are in the same general class as administrators of health care facilities or organizations operating health care facilities is subject to interpretation." Id. at 808 (Nigro, J., OISR). Furthermore, the Superior Court has noted ambiguity specifically with regard to the definition of a "review organization" under the Act. See Atkins v. Pottstown Mem'l Med. Ctr. , 430 Pa.Super. 279, 634 A.2d 258, 260 (1993) ("[I]t is questionable whether a risk manager is a 'review organization' to whom the protection of the [PRPA] extends."); see also Sanderson v. Frank S. Bryan, M.D., Ltd. , 361 Pa.Super. 491, 522 A.2d 1138, 1140 (1987) ("We are bound to ascertain the intent of the legislature in enacting the [PRPA] as we find the confidentiality section at issue in this appeal to be unclear.").
The Majority rejects MVH's contention that Dr. Walther's preparation and maintenance of a performance file for Dr. Boggs constituted "peer review" in the first instance, as defined by Section 425.2. This alone would suffice to nullify the privilege, and the Majority need go no farther. Indeed, the Majority rejects the proposition that any individual review of another doctor's performance can ever qualify as peer review in the relevant sense. In effect, the only "peer" that can qualify for the privilege is, in fact, a "review committee," i.e. , a group of peers.[3] However, the Majority *312 goes on to find that ERMI, which employed Drs. Walther and Boggs, is not a "professional health care provider"[4] as described by 63 P.S. § 425.2, which the Majority finds is a necessary predicate to application of the privilege in this case. The Majority maintains that ERMI does not qualify as such because it is not "approved, licensed or otherwise regulated to practice or operate in the health care field," as required of a "professional health care provider" by the Act. Maj. Op. at ----. The Majority also rejects ERMI's and MVH's claim that ERMI performed any peer review that did occur on MVH's behalf, and thus qualified for the privilege as a third-party professional health care provider retained to perform that function, id. at ---- - ----, here as part and parcel of its staffing, management, and exclusive operation of MVH's emergency department ("Department"). In this regard, the Majority first finds that MVH and ERMI failed to preserve this issue for appeal in the courts below. Id. at 306-08. In the alternative, the Majority effectively rejects any claims regarding what responsibilities arose under the contract between the parties because the contract was not introduced into the certified record, and because the parties' various assertions and arguments on the nature of that contract varied before the trial court. Id. at ---- - ----. I disagree with each of these conclusions.
The legislative intent underlying the PRPA is not controversial:
Peer review is the common method for exercising self[-]regulatory competence and evaluating physicians for privileges. The purpose of this privilege system is to improve the quality of health care, and reflects a widespread belief that the medical profession is best qualified to police its own. Thus, it is beyond question that peer review committees play a critical role in the effort to maintain high professional standards in the medical practice.
Cooper v. Del. Valley Med. Ctr. , 539 Pa. 620, 654 A.2d 547, 551 (1995) (citation omitted). Similarly, the McClellan OISA, drawing from the statutory definition of a review organization, reaffirmed the legislature's desire to "foster the greatest candor and frank discussion at medical review committee meetings," and to "encourage peer evaluation of health care provided" in order to improve quality, reduce negative results, and minimize costs. McClellan , 686 A.2d at 805 (quoting Robinson v. Magovern , 83 F.R.D. 79, 86 (W.D.Pa. 1979) ). The two OISRs agreed. See id. at 808 (Zappala, J., OISR) (observing that the PRPA "shield[s] the discussions that take place in medical review meetings to foster candor and frank opinions concerning prospective doctors' qualifications and patient care"); id. at 809 (Nigro, J., OISR) ("Through confidentiality, the state hoped to encourage peer evaluation of health care and improve the quality of the care rendered."). It is against this backdrop that we must evaluate the application and effect of the PRPA.
Dr. Walther performed peer review under the Act.
Appellants argue that, in defining a "review organization" to include, inter alia , *313 "any hospital board, committee or individual reviewing the qualifications or activities of its medical staff or applicants for admission thereto," the General Assembly intended to identify a review organization as "an entity or an individual engaged in peer review." Brief for MVH at 13 (emphasis omitted) (quoting Troescher v. Grody , 869 A.2d 1014, 1022 (Pa. Super. 2005) ). They assert that the Superior Court in Piroli v. Lodico , 909 A.2d 846 (Pa. Super. 2006), correctly held that "[w]hether a multi-person committee or an individual conducts the review is inconsequential-the overriding intent of the [l]egislature is to 'protect peer review records." Id. at 849 (internal quotation marks omitted).
Appellants contend that the Superior Court "failed to appreciate" that Dr. Walther was the Department's medical director, and thus was responsible for reviewing the performance of the physicians in her department. Brief for MVH at 14; see Walther Dep., 2/5/2014, at 46 (acting as "medical director"), 63-64 (explaining her responsibility for peer review).[5] As part of her oversight responsibilities, Dr. Walther pulled a cross-section of cases for each of her staff physicians on a quarterly basis and used them to evaluate the quality of care given by each, maintaining performance files to preserve her findings. Walther Dep., 2/5/2014, at 63-64. Appellants argue that the review of one physician by another is among the category of activities the Act is designed to protect.
The Reginellis only briefly address whether Dr. Walther acted as a review organization under the Act. In the paragraph they dedicate to the question, they note little more than that the Act is "replete with references to hospital committees," and argue that, "[o]bviously, the legislature and this Court are looking to protect the collaborative work of committees." Brief for the Reginellis at 18 (emphasis omitted).[6] The Majority agrees.
The statutory definition of a review organization effectively consists of three discrete parts, two of which are relevant to the question presented, and only one of which refers to an "individual." In its lengthy first sentence, the statute identifies a series of "committees" that are "engag[ed] in peer review ... to gather and review information relating to the care and treatment of patients for the purposes of (i) evaluating and improving the quality of health care rendered; (ii) reducing morbidity or mortality; or (iii) establishing and enforcing guidelines designed to keep within reasonable bounds the cost of health care." 63 P.S. § 425.2. In its second sentence, the statute identifies a second category of "review organization": "[A]ny hospital board, committee or individual reviewing the professional qualifications or activities of its medical staff or applicants for admission thereto." Id. (emphasis added).
The Majority finds no room in the second category to recognize an individual as conducting peer review, focusing upon the fact that the repeated usage of the term "committee" in the first category of review *314 organization suggests that the absence of same from the second category means that whatever it is the second category of review organization is doing, it cannot be peer review. If "committee" and "individual" are used interchangeably, the Majority finds, then "the reference to both ('committee or individual') in the second sentence of the definition of 'review organization' would constitute unnecessary surplusage, which is not permissible under basic statutory construction principles." Maj. Op. at ---- (citing, inter alia , 1 Pa.C.S. § 1921(a) ). The Majority further notes that "review committee" and "review organization" refer to "distinct types of entities under the PRPA," with only the former associated with "peer review." Id. at ----. To give discrete effect to the second sentence, the Majority identifies "professional qualifications or activities" as addressing solely "a physician's credentials for purposes of membership (or continued membership) on a hospital's medical staff." Id. at ----.
There is some appeal to this reading. However, to exclude a given physician's patient care from "professional activities" is at odds with a common understanding of that term in its statutory context. No "activity" is more tied to a health care provider's profession than the delivery of care. Moreover, if "professional qualifications and activities" refer, together, only to "credentials," then we encounter a different surplusage, given that "qualifications" and "credentials" effectively are synonyms. This calls into question how "activities" separately contribute to the "credentialing" process. Compare "qualification ," AMERICAN HERITAGE COLLEGE DICTIONARY (3d ed. 1993) ("1. The act of qualifying or the condition of being qualified. 2. A quality, an ability, or an accomplishment that makes a person suitable for a particular position or task. 3. A condition or circumstance that must be met or complied with.") with "credentials ," id. ("Evidence or testimonials concerning one's right to credit, confidence, or authority.").
The bright line that the Majority seeks to draw between a review organization and a review committee cannot be sustained by the statutory text read holistically. In effect, the distinction breaks down in Section 425.4, which is the section that confers confidentiality. That section, entitled "confidentiality of review organization's records," refers in its text only to "review committees." If in all PRPA uses we are to understand "organization" as distinct and more broadly inclusive than "committee," then the second definition of review organization, at least to the extent it pertains to individuals and hospital boards, enjoys no confidentiality at all. The Majority seems to allow that individuals may invoke the confidentiality provision of Section 425.4, but only in connection with the "credentialing" process. It so holds because the first sentence of the definition of "review organization," which expressly cites "peer review," refers only to committees in that connection. But that is true, as well, of Section 425.4. Extending the Majority's own reasoning with respect to Section 425.2 to Section 425.4, the privilege described cannot apply to an individual , regardless of the nature of the review in question-whether peer review or credentialing. In assessing whether the statute is ambiguous, we must view the text in its full context. Viewing the statute as a whole, I find that the meanings of "review organization" and "review committee" ultimately confound the bright-line distinction the Majority attempts to draw.
The meaning of these terms being less than clear, the Court should turn to consider "[t]he occasion and necessity for the statute," "[t]he mischief to be remedied," "[t]he object to be attained," and "[t]he consequences of a particular interpretation."
*315 1 Pa.C.S. § 1921. Under the Majority's account-in which "committee" in all uses means that and nothing else-no record is confidential if it pertains to reviews by any review organizations that are not described as "committees," and indeed is not peer review at all (despite the fact that the protection of "Peer Review" is the sole subject in the Act's title[7] ). Accordingly, any information provided to an individual in connection with assessing the "professional qualifications or activities"-including, for example, information regarding prior malpractice or professional misconduct-would be discoverable. This, notwithstanding that the risks associated with disclosure, including the provision of information necessary to candid, informed assessments of a given professional's quality of care, are no less present in that context than in a committee-conducted peer review process. To say the least, this is an unreasonable interpretive result in the context of a compact, focused statute expressly labeled the "Peer Review Protection Act." This is especially so given the broad account of the intent underlying the Act that has been offered by this Court, echoed in lower court opinions several times over the years, and is acknowledged by the Majority itself herein. The Majority's reading leaves the door open to precisely the same chilling effect upon free and frank discussions aimed to ensure and improve an appropriate quality of care that the PRPA strives to vitiate.
I am reluctant to impute to the General Assembly the belief that effective peer review, and the objects it seeks to advance, can be achieved only when engaged in by two or more qualified professionals, so as to constitute a "committee." Under this account, no one supervisor can assess a given physician's performance negatively without risking exposure as the source of criticism, but if he or she does so with a colleague, and calls the twosome a "committee," precisely the same assessment is privileged.[8] If the legislature intended to protect health care providers who render candid opinions that serve the overarching goal of improving the quality of care, this interpretation undermines that intent. In doing so, it violates our presumption that "the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable." 1 Pa.C.S. § 1922(1).
Dr. Walther's performance file for Dr. Boggs contains charts documenting Dr. Boggs' management of dozens of cases other than the one that underlies this litigation. Dr. Walther pulled these charts to assess the quality of care provided by Dr. Boggs. Dr. Walther plainly is a professional peer to whom fell the responsibility to review the quality of services performed by Dr. Boggs, a physician under Dr. Walther's oversight, for patients in the department Dr. Walther managed. I believe that this was a species of peer review performed by an individual as provided by the second sentence of Section 425.2's definition of "review organization," and that applying the privilege would best serve the General Assembly's intent.
ERMI is a professional health care provider.
The Superior Court ruled that "ERMI, as an independent contractor staffing the Hospital's emergency room, is not an entity *316 enumerated in the Act as being protected by [the] peer review privilege." Super. Ct. Mem. at 6. The Majority substantially agrees. Once again, the Majority proceeds from the premise that the plain language compels this result.
Hospital reliance upon contractors to operate departments[9] is not a new or rare phenomenon. This device has been employed by hospitals to increase efficiency as well as to reduce exposure to malpractice liability. See, e.g., Simmons v. Tuomey Reg'l Med. Ctr. , 341 S.C. 32, 533 S.E.2d 312 (2000) (considering hospital liability where emergency department was run by a contractor which retained the physician as an independent contractor); Martin C. McWilliams, Jr., & Hamilton E. Russell, III, Hospital Liability for Torts of Independent Contractor Physicians , 47 S.C. L. REV. 431, 432-33 (1996) (reviewing hospital's efforts to rely upon premise that principals are not liable for the physical torts of independent contractors).Amici curiae the American Medical Association ("AMA") and the Pennsylvania Medical Society ("PMS") note that such arrangements are especially common in specialties that must be staffed around the clock, such as emergency medicine, radiology, anesthesiology, and pathology. See Amicus Curiae Brief for AMA/PMS at 18, 19 n.7; see also Maj. Op. at ---- n.7 (citing Commonwealth, Dep't of Pub. Welfare v. Forbes Health Sys. , 492 Pa. 77, 422 A.2d 480, 481 (1980) ).
The Act furnishes the following definition:
"Professional health care provider" means:
(1) individuals or organizations who are approved, licensed or otherwise regulated to practice or operate in the health care field under the laws of the Commonwealth, including, but not limited to, the following individuals or organizations:
(i) a physician;
(ii) a dentist;
(iii) a podiatrist;
(iv) a chiropractor;
(v) an optometrist;
(vi) a psychologist;
(vii) a pharmacist;
(viii) a registered or practical nurse;
(ix) a physical therapist;
(x) an administrator of a hospital, nursing or convalescent home or other health care facility; or
(xi) a corporation or other organization operating a hospital, nursing home or other health care facility ....
63 P.S. § 425.2. Notably, the definitional section of the PRPA provides no definition that informs its uses of "other health care facility."
Although no opinion in McClellan commanded a Majority, the case offers some insight. In McClellan , the Court considered whether the peer review privilege extended to an "individual practice association" ("IPA")-model HMO. In her OISA, Justice Newman (joined by Justice Cappy, with Justice Nix concurring only in the *317 result) contended that it did not. The OISA focused upon the distinction between the IPA-model HMO at issue in that case, "which combines the delivery and financing of health care and which provides basic health services to voluntarily enrolled subscribers for a fixed prepaid fee"; a staff-model HMO, which "delivers services through its own physicians who are paid employees or staff of the HMO"; and a group-model HMO, which "contracts with a medical group, partnership, or corporation composed of health care professionals licensed to practice medicine or osteopathy as well as other health professionals necessary for the provision of health services." McClellan , 686 A.2d at 802 n.1.
First, the OISA observed that the Act's definition of professional health care provider was broad enough that the Court might or might not read it to exclude IPA-model HMOs. Thus, as an ambiguous statute, review pursuant to our principles of statutory construction was warranted. Turning to the Act, the OISA addressed the "including, but not limited to" language in the definition of professional health care provider in tandem with the enumerated list that followed it, and explained as follows:
It is widely accepted that general expressions such as "including, but not limited to" that precede a specific list of included items should not be construed in their widest context, but apply only to persons or things of the same general kind or class as those specifically mentioned in the list of examples. Under our statutory construction doctrine ejusdem generis ("of the same kind or class"), where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated. Where the opposite sequence is found, i.e. , specific words following general ones, the U.S. Supreme Court and the courts from several other jurisdictions recognize that the doctrine is equally applicable, and restricts application of the general term to things that are similar to those enumerated.
Id. at 805-806 (citations and internal quotation marks omitted); see Dechert LLP v. Commonwealth , 606 Pa. 334, 998 A.2d 575, 581 (2010) ("[T]he introductory verbiage 'including, but not limited to,' generally reflects the intent of the legislature to broaden the reach of the statute, rather than a purpose to limit the scope of the law to those matters enumerated therein.").
The OISA noted that, of eleven enumerated terms in the definition, nine specify individual health care workers, with the remaining two comprising "an administrator, and a corporation or other organization operating or administering," inter alia , a hospital or other health care facility. McClellan , 686 A.2d at 806. Thus, the HMO qualified for the privilege only if it could be regarded as an administrator of a medical facility. The OISA observed that an IPA-model HMO contracts with an individual physician or practice association, who typically work in their own offices, use their own equipment, and keep their own records. Thus, an IPA-model HMO generally has no health care facility and does not oversee patient care. Accordingly, it could not be regarded as the administrator or operator of a health care facility and was not a professional health care provider under the Act. Id. at 806-807.
In his OISR, Justice Zappala (joined by Justice Castille) rejected such a restrictive account, because HMOs are "held to have the same duties as hospitals to select and retain competent physicians." McClellan , 686 A.2d at 807 (Zappala, J., OISR).
*318 Among the core functions served by peer review are the selection, retention, and supervision of competent physicians. Thus, Justice Zappala opined that IPA-model HMOs were "of the same general nature or class" as hospitals and should be protected by the PRPA privilege. Id. In his own OISR, Justice Nigro noted that HMOs are obligated to "provide or arrange for patient care," including physicians' services, whether "directly or through arrangements with others." Id. at 808 (Nigro, J., OISR) (citing 40 P.S. § 1554(b) ). Justice Nigro concluded that this "puts HMOs in the same class as administrators of health care facilities and organizations operating health care facilities which also provide or arrange for patient care." Id. at 809. Thus, the OISA's more restrictive reading "ignore[d] the reality of health care today." Id.
The OISA, read in tandem with Justice Zappala's OISR, strongly suggests a common view among a majority of the then-sitting Justices. The OISA suggested a relatively expansive view of what constitutes the administration or operation of a health care facility, implying that it would be satisfied on that point if the entity in question employed its own physicians who practiced in facilities that were controlled by that entity. Justice Zappala, for his part, would have deemed the HMO a professional health care provider under the Act, despite its lack of staff or facility, simply because it was of the same general nature or class as those specifically enumerated under the Act. In this case, ERMI undisputedly maintained a staff of professional health care providers sufficient to administer and operate MVH's emergency department.
Appellants argue that it is "nonsensical" to find that the physicians and other individuals who comprise ERMI and define its commercial activities fall within the rubric of "professional health care provider" under item (i) of the definition, while ERMI itself lies outside it. Brief for ERMI at 29. They also argue that item (xi) includes corporations and organizations operating "health care facilities" as professional health care providers, and that ERMI, in staffing and operating the emergency department, qualifies. They further note that the lower courts' determinations that ERMI is a "business," and, as such, not a "health care provider" under the Act is belied by the Reginellis' own pleadings, which expressly asserted a "professional liability claim" against ERMI. See Plaintiffs' Amended Complaint ¶ 6.
To exclude ERMI, Appellants conclude, would confound the PRPA's intent by "ignor[ing] the reality of modern health care, where outside physician practice groups routinely staff and are integral to the operation of hospitals." Brief for Boggs and ERMI at 26 (emphasis omitted); see Brief for MVH at 17 ("[T]he Superior Court's decision to withhold peer review protection from reviews conducted by hospital staff members simply because they are employed by an independent physician group or similar independent contractor leads to an absurd and unworkable result."). They further argue that, even if we find no quarter for ERMI in items (i) or (xi), they nonetheless must be protected because the definition's employment of the "including, but not limited to" clause signals the legislature's intent that a professional health care provider not be limited to the specific terms of that list. See Brief for MVH at 20.
Conversely, the Reginellis contend that ERMI "merely employs health care providers," providing "physicians, non-physicians, legal services, billing/coding services and facility planning services to contracting hospitals." Brief for the Reginellis at 15. They note that the definition requires an individual or entity that is "approved, *319 licensed, or otherwise regulated to practice or operate in the health care field" under Pennsylvania law, and assert that ERMI is not so licensed or regulated. Id. at 16.
The Majority agrees, finding that "no principled reading" of the definition enables ERMI to overcome the qualification that a professional health care provider be "approved, licensed or otherwise regulated to practice or operate in the health care field under the laws of the Commonwealth." Maj. Op. at ----; see 63 P.S. § 425.2.
As noted, the statutory definition encompasses, inter alia , "a corporation or other organization operating a hospital, nursing home or other health care facility." 63 P.S. § 425.2. Furthermore, the list of eleven categories of individuals and entities who may be considered professional health care providers under the Act is expanded by the phrase "including, but not limited to," which invites the principled expansion of the list to include other individuals and organizations that share the relevant characteristics with those enumerated. See Dechert , 998 A.2d at 581.
"Hospital" and "health care facility" are used separately in item (xi) of the definition of "professional health care facility." Thus, the Court must assume that the legislature understood a "health care facility" to be broader than, if not simply distinct from, a "hospital." See 1 Pa.C.S. § 1921(a) (directing that we must "give effect to all [of a statute's] provisions"). Neither the lower courts nor the Reginellis specifically contend that the emergency department does not qualify as a constituent part of MVH or as a health care facility in its own right, and I have difficulty conceiving how any such contention could be true under a common understanding of those terms. Consequently, in reviewing item (xi), our focus should turn to the meaning of "a corporation or other organization" and what it means to "operate" a facility. ERMI plainly is a corporation; indeed, that is an essential premise to the Reginellis' argument. See Brief for the Reginellis at 16 ("ERMI ... is merely a business entity."). Furthermore, by any fair definition, ERMI "operates" the department.[10]
With respect to the "approved, licensed or otherwise regulated to practice or operate under the laws of the Commonwealth" qualification, the Majority relies for all practical purposes upon its determination that ERMI was neither licensed nor regulated to practice or operate in the health care field. Its plain language account is incomplete for failing to account for the word "approved" in a way that describes something other than the state of being "licensed" or "regulated." Maj. Op. at ----. The Majority's account also leaves little room for any unenumerated entity that might qualify under the "including, but not limited to" expansion of the enumerated class, rendering it a null set. Like several justices in McClellan , I believe that these gaps at least create ambiguity regarding whether ERMI qualifies as a "professional health care provider" under the Act.
Setting aside licensure for present purposes, and further setting aside "regulated" without conceding that it does not apply to a corporation whose agents operate a regulated health care facility, "approved" nonetheless must be given meaning and effect that is not encompassed in the terms "licensed" or "regulated." Thus, the Majority's apparent conclusion that ERMI is not a "corporation ... operating a ... health care facility" is suspect, given *320 that ERMI operates an entire hospital department, with all the hiring, oversight, and administration that this entails.
The question becomes one of approval or, perhaps, regulation. The Department, its staff providers, and MVH writ large are subject to myriad regulations, and MVH operates only with the approval of the Commonwealth and its agencies. Cf. 35 P.S. § 448.806(a) ("No person shall maintain or operate or hold itself out to be a health care facility without first having obtained a license therefor issued by the department."). Regardless of whom MVH hires to operate its facility, it has a non-delegable duty to ensure that the care administered within its four walls meets applicable standards, which includes the "duty to oversee all persons who practice medicine within its walls as to patient care." See Thompson v. Nason Hosp. , 527 Pa. 330, 591 A.2d 703, 707 (1991). Thus, MVH has final responsibility for ERMI's operation within the Commonwealth's statutory and regulatory requirements-and subject to the Commonwealth's approval, whatever discrete import we find in that term. Furthermore, as ERMI employees, Drs. Walther and Boggs are licensed and regulated by the Commonwealth.
We have noted, and the Majority does not dispute, that the Act aims to encourage full and frank assessments of health care providers by other health care providers who are best qualified for that task. Whether the licensure, approval, or regulation requirement that undisputedly applies to MVH and its emergency department applies by extension to the contractor through its promise to ensure that the hospital complies with all state requirements seems beside the point: to exclude ERMI on the basis that it is not a professional health care provider under the expansive statutory definition would create a circumstance in which application of the peer review privilege to proceedings associated with a hospital department depends solely upon whether the hospital operates its own department or contracts with an outside corporate entity to do so. Put simply, if MVH, as the employer of the physicians staffing the Emergency Department, conducts peer review activities, then the information generated for those purposes is protected. However, if ERMI, as the employer of the same physicians staffing the same department at the same hospital, conducts the same peer review activities, the Act offers no protection for information of precisely the same nature.
This Court should not adopt an unreasonable or impractical interpretation that so clearly frustrates legislative intent. See 1 Pa.C.S. § 1922 (directing us to assume that the General Assembly "intends the entire statute to be effective and certain," and that it "does not intend a result that is absurd, impossible of execution or unreasonable"). Thus, I would hold that ERMI is an operator of a health care facility by virtue of having taken sole responsibility for operating the Department. The Majority's contrary interpretation guts the privilege, given that such contractual staffing and administrative agreements are commonplace.
Sharing the performance file with MVH did not waive the privilege.
Also addressed in the courts below, and subject to our allowance of appeal, is whether, assuming the peer review privilege applied to Dr. Walther and ERMI, such privilege was waived when Dr. Walther provided the file to MVH. While the Majority touches upon this question, its conclusions that the file did not constitute peer review and that ERMI was not a professional health care provider render the issue moot, and the question only appears as a corollary to the Majority's primarily waiver-driven rejection of the proposition *321 that Dr. Walther performed peer review for MVH as a function of the contract between the parties. However, were my above-stated views to prevail, the question would be ripe. Accordingly, I take it up briefly.
In ruling in the alternative that Dr. Walther compromised any applicable privilege by sharing the file, the Superior Court attached great consequence to one sentence fragment drawn from Dr. Boggs and ERMI's joint Reply Brief in that court to the effect that the performance file was "created and maintained solely by Dr. Walther on behalf of her employer." Super. Ct. Mem. at 6 (quoting Super. Ct. Reply Brief for Boggs and ERMI at 6). Based upon that alone, the Superior Court concluded that MVH "cannot claim that the file is [MVH's] privileged peer review, since, as the trial court noted, 'it is untenable that [MVH] could claim a privilege for documents that it neither generated nor maintained.' " Id. (quoting Trial Ct. Op., 11/25/2014, at 2-3). The Majority agrees, and posits that contrary testimony constituted only "a snippet of Dr. Walther's deposition testimony in which she indicated that her peer review activities were performed for the benefit of both [ERMI] and MVH." Maj. Op. at ----, ----.
Although the Superior Court provided no further information, the trial court's assertion in this regard was based upon the proposition that "[t]he PRPA privilege, like other privileges, applies only to information which remains exclusive." Trial Ct. Op., 11/25/2014, at 2 (citing Dodson v. DeLeo , 872 A.2d 1237, 1243 (Pa. Super. 2005) ). Notably, though, it is MVH toward which the motion at issue is directed, and MVH generally has maintained that Dr. Walther's peer review activities were conducted on behalf of both ERMI and MVH. See , e.g. , Super. Ct. Brief for MVH at 24 ("Dr. Walther is regularly involved in peer review of all of the [Department] physicians and the quality assurance process for the [Department], on behalf of both ERMI and MVH .") (emphasis added). What the Majority diminishes as derivative of a mere "snippet" of Dr. Walther's testimony, which in fact appeared in several variations in the proceedings below,[11] the Majority rebuts by reference to its own chosen snippets. However, even the Reginellis' own attorney at one point provided support for Dr. Walther's account. See Boggs Depo, 4/18/2013, at 203 (counsel for the Reginellis: "[Dr. Boggs], there are some indications in this contract [i.e. , the contract between MVH and ERMI] that your employer required physicians to prepare and maintain in connection with your services all necessary and appropriate reports, *322 records, correspondence in connection with the services performed, all of which documentation shall be the property of the hospital .") (emphasis added).
If MVH had Dr. Boggs' performance file in its possession, as it plainly did, it was provided to it by Dr. Walther or another agent of ERMI. Furthermore, it "maintained" that file at least to the extent that it never threw it away and to the extent that it knew where to find it when asked. This contradicts any suggestion that the file was never intended to serve MVH's benefit, or was not sought by MVH as part and parcel of its business relationship with ERMI. MVH's possession and actual production of the performance file necessarily provides support for Dr. Walther's account regarding for whose benefit she reviewed Dr. Boggs and with whom she shared the consequent performance file.
Appellants argue that the practical consequences of affirming the lower courts' rulings are untenable:
It is extremely common, and should be encouraged, for health care entities to work together to meet the public's needs, while sharing information to maintain and improve health care quality. It is logical for an outside entity, like ERMI, to review its own employee who is being supplied to staff a hospital, and for the information to be shared with that hospital, which of course has an interest in quality control regarding the members of its medical staff. To discourage the sharing of valuable information thwarts the goals of the PRPA [and] conflicts with legislative intent ....
Brief for Boggs and ERMI at 38-39.
The lower courts' apparent reliance on "exclusivity" is at odds with the Act's broad definition of "review organization," which clearly anticipates possession of such records by an array of individuals and groups concerned with evaluating and improving the quality of health care, reducing adverse events, and controlling costs. Among the entities named therein are a hospital, health insurance tissue or review committee, "a hospital plan corporation review committee," "any committee established pursuant to the medical assistance program, and any committee established by one or more State or local professional societies." 63 P.S. § 425.2. Necessarily, these are third parties relative to those who delivered the care subject to review. Nothing in Section 425.2 suggests that the sharing or dual possession of a single peer review record necessarily vitiates an otherwise valid privilege. Indeed, the scope of the Act itself is difficult to understand except as authorizing the simultaneous possession of peer review materials by multiple individuals and entities. Taking the Reginellis' argument to its logical conclusion, any professional health care provider that shared its records with any of these bodies, or among two or more enumerated entities or groups, would waive the peer review privilege. There is no way to reconcile this with the legislature's manifest intent.
In light of the broad intent reflected by the Act, I believe that the privilege here at issue was intended to capture an entire sector of conduct performed by a swath of individuals, committees, and government bodies on behalf of providers, both human and institutional, to ensure the quality of health care and the accountability of providers. As noted, supra , where the legislature creates a statutory privilege and specifies exceptions to that privilege, we must consider that as evidence that it intended not to allow for other unspecified exceptions. See Commonwealth, Dep't of Transp. v. Taylor , 576 Pa. 622, 841 A.2d 108, 113 (2004) (upholding a statutory privilege barring disclosure of accident investigations and safety studies prepared for the *323 purposes of determining the causes of traffic accidents, noting that "the General Assembly is well aware of how to provide for such exceptions" to statutorily-defined privileges); Castellani , 956 A.2d at 951 ("[W]e are not at liberty to create other[ exceptions to the Shield Law] that the Legislature, in its wisdom, chose not to include in the text of the statute."); see also 1 Pa.C.S. § 1924 ("Exceptions expressed in a statute shall be construed to exclude all others.").
Like the Shield Law in Castellani , the PRPA delineates exceptions.[12] I see no reason to approach this case differently, especially because the benefits of the Act plainly are realized when it encourages broader rather than narrower peer review and provider accountability. Furthermore, this avoids the destabilizing effect of making a privilege designed to ensure peer accountability contingent upon the corporate structure or staffing model of a given health care provider, which the provider adopts for reasons entirely distinct from provider accountability and quality of care. I would find that the inclusion of specific statutory exceptions to the privilege indicates the legislature's intent to create no other.
A hospital must monitor the performance of its credentialed physicians, whether they are employed directly by the hospital or by a contractor, not least because plaintiffs in claims involving alleged medical malpractice are likely to claim corporate negligence against that entity when they believe that the hospital has violated its non-delegable duty to ensure the quality of care-as the Reginellis have alleged in this case. See Thompson , supra . It also seems obvious that the administrator of a given hospital department-whether employed by the hospital or an entity retained by the hospital to assume such duties-is best positioned to review the physicians who staff that department.
For all practical purposes, MVH, ERMI, and Drs. Walther and Boggs comprise a collective responsible for ensuring that the care delivered in the Department, and specifically the care provided by Dr. Boggs, and more specifically still the care provided by Dr. Boggs to Mrs. Reginelli, satisfied the standard of care. The well-established statutory mechanism for doing so is professional peer review, and the legislature clearly has found that confidentiality is critical to such review. Nothing in the PRPA suggests that sharing review materials among a chain of vertically integrated providers who collectively are responsible for a given health care facility should result in waiver of that confidentiality. See Armstrong v. Dwyer , 155 F.3d 211, 220 (3d Cir. 1998) ("The bar against discovery [of peer review-related documents] runs with the documents or information, not with the organization or individuals who happen to possess the documents or information at any given time."). Thus, I would find that the lower court erred in finding otherwise. Accordingly, I respectfully dissent.
Chief Justice Saylor and Justice Todd join this dissenting opinion.

See Act of July 20, 1974, P.L. 564, No. 193, § 1, as amended, 63 P.S. §§ 425.1, et seq.

For purposes of my discussion, I incorporate by reference the Majority's account of the factual and procedural background that led to this appeal. See Maj. Op. at ---- - ----.

The Majority allows that an individual physician qualifies as a "review organization" to the extent she serves as an "individual reviewing the professional qualifications or activities of its medical staff or applicants for admission thereto." 63 P.S. § 425.2. However, as discussed below, the Majority maintains that any such review of a physician's "qualifications or activities" necessarily goes only to credentialing, which is not at issue in this case. See Maj. Op. at ---- - ----.

The Reginellis and the Majority do not appear to dispute that Dr. Walther and MVH are professional health care providers.

To similar effect, the American Medical Association ("AMA") and Pennsylvania Medical Society ("PMS"), as amici curiae , observe that the Superior Court "fail[ed] to recognize the cooperative nature" of the arrangement among the Appellants. Amici Curiae Brief for AMA/PMS at 18. "Dr. Walther may have been [an] ERMI employee, but she was also a credentialed member of [MVH's] staff and effectively the Department Chairman. At bottom, [MVH] was sharing with itself." Id.

The Reginellis have submitted materially similar, but nonetheless distinct, responsive briefs to the separate briefs of MVH and UPMC. All citations to the Reginellis' briefing in this case refer to their MVH brief, at 20 and 21 WAP 2016.

See 1 Pa.C.S. § 1924 ("The title ... of a statute may be considered in the construction thereof.").

This same stringent reading informs the Majority's reliance upon the fact that, while MVH was given and maintained possession of Dr. Boggs' performance file, that file did not specifically reside with MVH's "peer review committee." Maj. Op. at ----.

The Majority understates the degree of ERMI's control of MVH's emergency room. See Maj. Op. at ---- - ---- (observing that MVH contracted with ERMI "to provide staffing and administrative services for its emergency room"). The Reginellis themselves provide a more expansive account of ERMI's role at MVH. See Brief for the Reginellis at 15 (noting that ERMI provides "physicians, non-physicians, legal services, billing/code services and facility planning services to contracting hospitals"). Furthermore, Dr. Walther testified that she functioned as the Emergency Department's "medical director." See Walther Dep., 2/5/2014, at 46 (acting as "medical director"). There is no dispute on this latter point.

See "operate ," American Heritage College Dictionary (3d ed. 1993) ("tr. 1. To control the function of; run. 2. To conduct the affairs of; manage.").

See, e.g., Walther Dep., 2/5/2014, at 64-66 (Dr. Walther testifies that she performed various peer review activities "on behalf of [MVH] and ERMI," and that, if an issue emerges during peer review, she forwards it to MVH's peer review committee and to her superior at ERMI); cf. id. at 67 (indicating that retention decisions, where there's "a care issue involved," are "joint" decisions of MVH and ERMI); Motion for Reconsideration of the Court's August 29, 2014 Order of Court and for In Camera Review, 9/22/2014, at 4 ("Dr. Walther is regularly involved in peer review for all the [emergency department] physicians and the quality assurance process ... on behalf of both ERMI and MVH."), 5 ("[F]or peer review, [Dr. Walther] reviews records of patient files when an issue is raised or a review is requested by staff or administration of MVH or ERMI"); N.T., 6/9/2014, at 71-72 (counsel for MVH, arguing in opposition to the Motion to Compel: "Dr. Walther, as part of our-as our supervisor, if you will, of the emergency department, part of our contractual relationship with ERMI , ... it's all part of that package that we do core measures and these other things .... [E]verything [the Reginellis] are asking for is an ongoing, everyday activity that the hospital does and is required to do in order to stay on top of this stuff." (emphasis added) ).

See 63 P.S. § 425.4 (denying the privilege as to "information, documents or records otherwise available from original sources ... merely because they were presented during proceedings of such committee"; allowing an individual who appears before or is a member of a peer review committee to testify "as to matters within his knowledge," although he "cannot be asked about his testimony [in] or opinions formed by him as a result of said committee hearings"); cf. 63 P.S. § 425.3 (immunizing certain persons involved in peer review from criminal culpability or civil liability for information provided unless the person knew, or had reason to believe, that the information was false).